JACKSON, *ex dem.* HUMPHREY and others, *against* GIVEN and others.

THIS was an action of ejectment, to recover the possession of lot No. 30. in the town of *Dryden*, in *Cayuga* county. The cause was tried before Mr. Chief Justice *Kent*, at the *Cayuga* circuit, the 12th *June*, 1810.

The plaintiff read in evidence letters patent from the people of the state, dated *July* 8, 1790, granting the lot in question to *Alexander Umphrey*, one of the lessors, &c. for his services as a soldier in the army, &c.; a deed from the patentee, in *Upper Canada*, dated 5th *February*, 1795, for the consideration of 200 dollars, to *Samuel Umphrey*, which was proved and recorded in the office of the clerk of *Cayuga*, on the 4th *February*, 1807.

The defendants produced a deed, dated 28th *June*, 1793, which had been duly deposited in the clerk's office, from *Alexander Humphrey* to *Timothy Benedict;* and *Frederick Knox*, a witness, testified, that he saw the deed executed by the grantor, who called himself *Alexander Humphrey*, at *Fairfield*, in the state of *Connecticut*, and who said he had been a serjeant in the army. He appeared to be about 45 years of age, and said he was a native of *Fairfield;* but the witness never saw him before nor since that time.

*In 1790 a patent was granted for a military lot to A., who had been a soldier in the army of the United States; and who, in February, 1795, sold and conveyed it to B. C., in 1793, purchased the same lot of a person, pretending to be the original patentee, and fraudulently executed a deed for the lot to C., who afterwards conveyed it to D., who sold it to various persons, who took possession under him. In August, 1804, A., the real patentee, executed another deed for the same lot to W., which was first recorded; and in 1806 D. purchased the title of W. and took a deed from him, which was also recorded. In an action of ejectment brought by B. against the persons in possession under D. it was held, that a void title; but for the benefit of the purchase by W.; and that the persons holding under D. had a right to protect themselves by the title of W. equally as if they had purchased it of W.*

*when W. purchased of A., in 1804, the land was held adversely under a as D. afterwards purchased the title of W., derived from the real patentee, of those in possession, B. could not set up that adverse possession, to defeat W.; and that the persons holding under D. had a right to protect themselves W. equally as if they had purchased it of W.*

*The deed from the patentee to W., being first recorded, was entitled to a preference, under the statute, there being no satisfactory proof of an actual or implied notice to W. of the prior deed to B.*

*To defeat the prior registry of the second deed, there must be fraud or undoubted notice.*

*If one affected with notice conveys to another without notice, the latter is as much protected, as if no notice had ever existed.*

A deed was produced from *Timothy Benedict* to *Josiah Masters*, dated 16th *July*, 1793, for the lot in question.

A witness for the plaintiff testified, that he knew *Alexander Umphrey* more than 40 years ago ; he resided in *Wallkill*, in *Ulster* county, and enlisted in the army during the last war, and the witness heard that he was a serjeant. After the war, he returned to *Walkill*, where he resided about a year, and then removed into *Washington* county, from whence he went to *Canada.* The witness knew him well, and that he always wrote his name *Alexander Umphrey*, not *Humphrey*, and the witness had seen him frequently sign his name, in that manner.

The defendant then produced a deed from *Alexander Umphrey*, to *Judah Williams*, dated *August* 31, 1804, which was recorded 7th *April*, 1806; and a deed from *Judah Williams*, dated 9th *April*, 1806, to *Josiah Masters*, which was duly recorded.

It was proved that *Scofield*, one of the defendants, about 7 years since, purchased 200 acres, part of the lot, of *John Atkinson*, and took possession; and two other of the defendants occupied parcels under *Scofield*, and two other of the defendants purchased of *Atkinson* 100 acres of the same lot, of which they took possession. *Atkinson* claimed title to the whole lot, by virtue of a deed from *Josiah Masters*, executed prior to the 31st *August*, 1804, and *Scofield*, *Ingersoll* and *Smith*, were in possession prior to that time. *Judah Williams*, afterwards, brought actions of ejectment against them, and, pending the suits, *Masters* purchased the title of *Williams*, and the suits were discontinued.

It appeared that *Alexander Umphrey* died at *Augusta*, in *Upper Canada*, the 18th *May*, 1806. And it was proved that he had said, that he was in the army of the *United States*, in the *New-York* line, and had drawn his bounty lands. A witness also testified that the deed of

the 5th of *February*, 1795, from him to his brother *Samuel Umphrey*, was executed at *Augusta.*

A witness also testified that he knew *Judah Williams*, and saw him at *Augusta*, in *August*, 1804. *Williams* said to him, " that *Alexander Umphrey* had drawn a valuable lot of land in *New-York*, which he should be glad to purchase, but he had understood that *Umphrey* had fooled it away, and had sold it several times, and did not consider it worth his trouble to look about it."

The jury, under the direction of the judge, found a verdict for the defendants.

A motion was made on the part of the plaintiff, to set aside the verdict, and for a new trial.

*Rodman* and *Shepherd*, for the plaintiff.

*E. Williams*, contra.

KENT, Ch. J. delivered the opinion of the court. 1. When *Williams* purchased of the patentee, in *August*, 1804, *Atkinson*, and those in possession under him, held the lot adversely, under a false title derived from a fraudulent source, and not from the real patentee. But as *Williams's* title was afterwards purchased in, by *Masters*, for the benefit of *Atkinson*, and those in possession under him, the lessors of the plaintiff cannot set up, against those very tenants, that adverse possession to defeat the purchase by *Williams*. The defendants have a right to protect themselves under that title, equally as if they had themselves purchased it, in the first instance. Why not? The party in possession may always purchase in an. outstanding title; and *Atkinson* and those under him have a right, by the purchase under *Williams*, to connect themselves with the patentee. The prohibition from purchasing pretended titles was intended for the benefit of the party, at the time in possession; and it ought

not to be used as a weapon against such party. This would be defeating the very object and policy of the rule. In the case of *Keite* v. *Clopton*, (*Carter*, 18.) Sir *O. Bridgeman*, Ch. J. said, " that an act may be void in several degrees; 1. Void, so as if never done, to all purposes, so as all persons may take advantage thereof ; 2. Void to some purposes only; 3. So void by operation of law, that he that will have the benefit of it, may make it good." *Quisquis potest renunciare jure pro se introducto.* The statute allows the party in possession to buy any pretended title; and there is no reason that the rule making the purchase of a pretended title void, should be applied to a purchase set up by the very party in possession at the time. The title so set up cannot be to the prejudice of any person. It is not within the mischief of maintenance.

The deed from the patentee to *Williams* being first recorded, is entitled, by the statute, to a preference. Nothing can defeat this preference, but the fact that *Williams*, when he made the purchase, had notice of the prior conveyance from the patentee of the 5th of *February*, 1795. There is no pretence that he had any express knowledge of that specific conveyance; and the only ground from which we can deduce any implied or constructive notice of it, arises from the conversation which *Williams* had with a third person, about the time of the purchase, in which he said that " he had understood that *Umphrey* had fooled away the lot, and had sold it several times, and did not consider it worth his trouble to look about it." Even, if we were to admit that *implied* notice will supply the absence of the registry of the prior conveyance, this conversation, unaccompanied with other circumstances, is too loose to justify the inference of such notice. The purchaser under the prior deed was not in possession, and never had been. That deed had been executed nine years before, and had been suffered to remain dormant, not only without being recorded, but

without any transfer of possession, or any act of owner-
ship on the part of the purchaser.   If the vague reports
which *Williams* might have heard, be applied to this
particular prior deed, he might well have presumed that
it was not *bona fide*, or had been cancelled; and it would
be rigorous to deprive him of his regular legal title un-
der the statute, by the imputation of a fraud so imper-
fectly supported.   In the case of *Hine* v. *Dodd*, (2 *Atk.*
275.) Lord *Hardwicke* said, that mere suspicion of no-
tice was not enough to break in upon the registry act;
and that nothing short of fraud, or clear and undoubted
notice, would do.   This decision was cited with much
approbation by the master of the rolls, in *Jolland* v. *Stain-
bridge*. (3 *Vesey*, 478.)   But if *Williams* did purchase
with notice, the subsequent purchase by *Masters* from
him is not to be affected by the fraud of *Williams*.   It is
a settled rule, that if one affected with notice, conveys
to one without notice, the latter shall be protected equal-
ly as if no notice had ever existed.   (2 *Vern*. 384.   2
*Fonb*. 153.   *Amb*. 313.   1 *Johns. Rep.* 573, 574.)

The motion, on the part of the plaintiff, ought, there-
fore, to be denied.

Motion denied.