Catón, Justice, delivered the opinion of the court: (1) This bill was filed in the Hancock circuit court for the purpose of compelling a specific performance of an agreement for the sale of two lots of land in that county. The agreement, which is set out in the bill verbatim, appears to have been entered into ["*' 243] on the 23d of May, 1835, and provides for the sale of the premises in question for the sum of $1100, of which “a certain sum” was to be paid in hand on the second of June then nest; one stable horse from the first to the tenth of July then nest, the value of which was to be assessed by three disinterested persons, in ease of disagreement between the parties, and Doyle was to give his note for the balance of the $1100, payable in fifteen months from the date of the agreement. The circuit court entered a decree dismissing the bill at the complainant’s costs, which, by this appeal, we are now called upon to revise. The first enquiry which most properly presents itself in the examination of this case is whether Munson, one of the defendants in the bill, is a subsequent bona fide purchaser without notice, or whether he is chargeable with notice. It appears that the contract with the complainant was entered into on the 23d of May, 1835, and was recorded on the 19th óf June following, and the deed of the same premises from Teas to Munson was executed on the 26th of May and recorded on the 26th of June. If Munson is chargeable with notice, then he but fills the shoes of Teas, and either as his trustee for that purpose, or as his assignee, he shall make good the obligations which, by the contract, are imposed upon Teas. If he was not chargeable with such notice when the deed was executed or took effect, then he shall hold under it, notwithstanding whatever rights, either •legal or equitable, may be shown to exist between Doyle and Teas. What is sufficient to constitute this notice is frequently a question of no small difficulty and a subject on which much has been written, and, after all, not a great deal very definitely settled. This notice is sometimes a question of law arising upon facts about which there is no dispute, and it is sometimes a question of fact. The former is called constructive notice, the latter actual notice. Constructive notice is made out frequently by a lis pendens, by the record of the prior title or claim under the recording act; by the possession of the person having notice, or by the purchaser receiving his title through a channel which, with proper attention, -would have led him to a knowledge of the interests with a notice of which he is charged. In this case it is attempted to make out notice in both of these ways, or rather, in the first place, an attempt is made to bring home actual notice to the agent of Munson who made the purchase for him — which, if established, is but another mode of proving constructive notice on that defendant himself, whereby his conscience shall be as much affected as if the actual notice were proved on him personally; — and in the second place it is contended that constructive notice is made out under our recording act. The greatest difficulty has been experienced in laying down any general rule by which the court can be governed as [*244] to the amount of evidence which is necessary to make out actual notice; for between the slightest and most indefinite (which, if shown to have reached the ears of the defendant, could raise no suspicion of good.faith on his part), and the most positive proof of actual knowledge, brought directly home to the person'of the party, there is an infinite number of gradations, and where the true line of demarcation is between these two extremes has never yet been so distinctly settled as to leave no difficulty in the application to individual cases as they arise. There seems, indeed, to be two classes of cases, one of which appears to require the most clear and certain evidence of actual knowledge, such as will establish fraud on the part of the subsequent purchaser, while, in the other, only such notice is required to be proved as would be sufficient to put a prudent man on enquiry ; and I confess I have searched in vain to find the distinction anywhere laid down by which we may be enabled to distinguish them in their features and circumstances. In this case the complainant insists that it was only necessary for him to adduce sufficient proof to bring the case within the latter rule ; while, by the defendant Munson, it is contended that he is only to be prejudiced by such clear and positive proof of notice as would establish fraud in him; and for the purpose of enabling us the better to judge by which of these rules we shall be governed in determining what shall be the amount of evidence required to make out this notice it is necessary to advert to some of the leading cases relied upon in support of each position. In the case of Hines v. Dodd, 2 Atk. 275, where a subsequent mortgagee was attempted to be charged with notice of a prior judgment, which was not registered till after the mortgage, although the denial of the notice by the defendant was feeble, and, to say the least, evasive, and the proof of the notice strong, still the court held the proof insufficient, and say: “ Tobe sure apparent fraud, as clear and undoubted notice, would be a proper ground of relief, but suspicion of notice, though a strong suspicion of notice, is not sufficient to justify the court in breaking in upon an act of Parliament.” Andón the same side is cited the case of Joland v. Stambridge, 3 Vesey 478, where a subsequent registered conveyance took precedence of a prior unregistered deed, notwithstanding strong evidence of notice; and this case seems to carry the principle quite as far as the case above, and clearly holds that nothing short of actual fraud shall supersede a conveyance actually recorded. So in the ease of Wyatt v. Barnell, 19 Vesey 435, where the question was whether there was sufficient proof of notice to give the prior unregistered deed a preference (and there was very strong proof of constructive notice), yet the master of the rolls held it insufficient, and after alluding to the decisions says: “However, it is sufficient for,the present purpose [*245] to say, that it is only by actual notice clearly proved, that a registered conveyance can be postponed. Even a Us pendens is not deemed notice for that purpose.” This case then holds distinctly that no constructive notice will suffice to defeat a deed regularly registered; but this cannot be pretended to be the law now. In Dey v. Dunham,, 2 Johns. Ch. R. 182, most of the above cases were cited with approbation by chancellor Kent. The question there was whether a junior registered assignment should be set aside in favor of a prior mortgage deed, which was not registered in the proper book of mortgages. The chancellor says: “If notice that is to'put a party on enquiry be sufficient to break in upon, the policy of the express provisions of the act, then indeed the conclusion would be different; but I do not apprehend that the decisions go that length. This would be too slight a foundation to act upon in opposition to the statute.” In Jackson v. Van Valkenburgh, 8 Cowen 260, the question again arose as to the sufficiency of the parol proof of notice, to give effect to a prior unrecorded mortgage; and although the proof was strong to establish notice to the agent of the subsequent mortgagee, yet the court held it insufficient, and says : “It may have answered to put d person on enquiry, in a case where that species of notice is sufficient, but we have seen, to supply the place of registry, the law proceeds a step further, and as it appears to me upon the most substantial reasons, for if the second conveyance is not regarded as bona fide, because, in consequence ■ of notice, it is tainted with fraud, and that imputation ought not to rest on slight grounds, but be supported by evidencb clear and explicit.” The same doctrine was also held in the case of Jackson v. Givan, 8 Johns. 137, by chief justice Kent, where the question was, which deed was the best, the first in date, or the first on record ? Jackson v. Burgatt, 10 Johns. 457, presents one of the few instances to be met with where the unregistered deed has been allowed to triumph over the registry, in an ejectment case. The court in that case says: “ That the defendant and every other person through whom he derived title, had, at the time of their purchase, actual notice of the prior conveyance.” “ The purchase of Tiffany had every appearance of a gross fraud,” etc. In this case we find the same strict rule held, as to the character of the notice, which must be proved to effect the object sought; but by looking into the evidence reported in the case, we find that the rule laid down, by Mr. Sugden (Sug. on Vend. 490, Ch. 8), “that to constitute a binding notice, it must be given by a person interested in the property, and in the course of the treaty for the purchase,” was not observed, but the notice which fastened the fraud on the defendant and his grantors, was eommuni-[*246] cated by Towzer and Throop, neither of whom appears to have ever had any interest in the premises. In discussing this branch of the law, chancellor Kent, in his commentaries, 4 Kent’s Com. 171, says : “the doctrine of notice and its operation in favor of the prior unregistered deed or mortgage, equally applies, as I apprehend, throughout the United States; and it everywhere turns on a question of fraud, and on the evidence requisite to infer it. In pursuance of that principle, and in order to support, at the same time, the policy and the injunctions of the registry acts, in all their vigor and genuine meaning, implied notice may be equally effectual, with direct and positive notice ; but then it must not be that'notice which is barely sufficient to put the party on enquiry;” and judge Story (1 Story’s Eq. 893) holds substantially the same rule, though not perhaps in quite so strong language. He says, when the first deed is not properly recorded, “then the subsequent purchaser is affected only by such actual notice as would amount to a fraud.” It is perhaps unnecessary to cite further from the books, to show what is the effect to be produced when that clear and distinct proof of notice has been required which should be sufficient to prove the subsequent purchaser guilty of a fraud, and which should be something more than enough merely to put the party on enquiry. In all the instances referred to, (and I have met with none of a different character,) it is clear that it is to give effect and-priority to an unregistered instrument, which by the registry act is required to be recorded, in preference to one subsequent in date, which has been duly recorded. But by looking through the cases it will be frequently seen, that what one judge holds to be only sufficient to put a party on enquiry, another will hold sufficient of itself to preve him guilty of fraud; thus showing more a difference in terms, than in substance ; while others, professing to adhere to the same measure of proof, have really differed, very widely in the amount required. Let us now burn our attention to that class of cases where it has been held sufficient to show such notice as should put a party on enquiry. In Smith v. Low, 1 Atk. 49, the case was this. The mother of some infants leased their land for forty-one years, with covenants that they should join, etc., after they became of age. They received the rents fora long time, and then brought ejectment, and the bill was filed against them to confirm the lease, and the court held that the lease should be established, and said: “ They found a person in possession of the estate, and that was sufficient to put them to enquire ; and what is sufficient to put the party on en-quiry is good notice in equity.” It maybe remarked in rela-' tion to this case, and the same remark will apply to most if not all of the subsequent cases, that no question is [*247] raised in relation to the registry acc, but the court simply decide that possession by the tenant ivas such notice to the heirs, as should bind them by their acquiescence; and I apprehend that it is too late at the present day to deny the sufficiency of such notice whether the registry act be involved or not. Faires v. Cherry, 2 Vern. 384, is also cited in support of the proposition, that if the party is put to enquire, it is sufficient. There, at the time of the purchase, the defendant liad in his possession, among other papers, the settlement under which the plaintiff claimed, and the court held him chargeable with notice; and although this case was afterwards doubted, yet it is now one of the most familiar instances of conclusive notice. And I venture to say such proof has never been held insufficient. 'To the same effect is the case of Parker v. Brooks, 9 Vesey 583. There it was hold where the deed under which the defendant holds recites the grounds of the other party’s equity, that he shall be chargeable therewith. Daniels v. Davidson, 16 Vesey 249, was a bill for the specific performance of an agreement for the sale of land, and in that case it was held that the possession of the complainant, although he held the possession not under the agreement but under an unexpired lease, was such notice as should have put the party on en-quiry, and was therefore sufficient against the subsequent purchaser. It may be observed here, that under the registry laws of England, this agreement was not required or even allowed to be recorded. In the case of Starry v. Arden, 1 Johns. Ch. R. 261, it does not appear that either deed was recorded, nor is the registry act once alluded to. There the court held the defendant chargeable with notice, on what seems to me very light grounds. The chancellor says: “I shall also consider him a purchaser without actual .notice of the settlement on the plaintiffs. He declares in his answer that he had no knowledge or notice of the conveyance of 1805, when he purchased, and there is not proof to contradict this answer. Rut I hold him chargeable with constructive notice or notice in law, because he had information sufficient to put him on enquiry. He admits that before the execution of the deed, he had heard that the grantor had made some provision for his daughters, out of the property in Greenwich street; and there is no evidence in the case that the grantor owned any other property in that street.” Here he holds constructive notice equivalent to actual notice. This case was affirmed in the court of errors. In the case of Green v. Slater, 4 Johns. Ch. R. 39, it was held that a lis pendens was sufficient notice to put the party on enquiry, although the description of the premises in the bill was [* 248] so very general and uncertain, that it was impossible for the party to determine that the lands which he purchased were included in those described as “ divers lands in Crosby’s Manor;” and in that case the defendant in his answer denied all knowledge of the pendency of the suit, and there was no proof against the answer. It is perhaps unnecessary to pursue this class of cases further; enough have already been presented to show the general characteristics of those cases where it has been held sufficient notice to show such knowledge as should put the party on enquiry. Most elementary writers on the law of evidence, however, where they lay down this rule, speak of it as applicable to all cases in equity where notice is required. Thus Mr. Justice Story, in his commentaries on equity, (1 Story’s Eq. 388,) after stating what has beeh held sufficient evidence of notice in some particular cases, proceeds: “Indeed the doctrine is still broader, for whatever is sufficient to put a party on enquiry, (that is whatever has a reasonable certainty, as to time, place, circumstance, and persons,) is in equity held to be good notice to bind him;” and this is said of such notice as shall postpone a subsequent registered deed or mortgage. And chancellor Kent, in his commentaries, .(4 Kent’s Com, 179,) says. “The doctrine of notice is also very extensive application throughout the law of mortgage; and it is very greatly surcharged with cases abounding in refinements. It is indeed difficult to define with precision the rules which regulate implied or constructive notice, for it depends upon the infinitely varied circumstances of each case. The general doctrine is, that whatever puts a party upon enquiry amounts in judgment of law to notice, provided the enquiry becomes a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the fact, by the exercise of ordinary diligence and understanding.” I confess, after all the investigation I have been able to give the subject, that I am still unable clearly to comprehend the distinction in. principle, or rather the difference in circumstances, between those cases, where the stronger evidence is required, and those cases where such evidence has been allowed to prevail as it was said was sufficient to put the party upon enquiry. Nor have those learned commentators from whom I have quoted above, that I am able to discover, told us the distinctions, between the cases where they say that such notice as should put the party to enquire will suffice, and where not. Thus we find judge Story, at page 393, above quoted, for the purpose of postponing a subsequent purchaser, whose deed is recorded, requiring proof of “such actual notice as would amount to a- fraud,” and the same rule is substantially laid down at page 387, in § 398; while in the two next succeeding sections, for precisely the same purpose, we find him holding, that constructive notice answers every purpose of actual notice, and that it will amount to such [* 249] constructive notice, if enough be shown to put the party upon enquiry. So also we have seen chancellor Kent, at page 171, saying that, for the purpose of giving the prior unregistered deed or mortgage a preference, implied notice may do; “ but then it must not be that notice which is barely sufficient to put the party upon enquiryand yet we find him at page 179 when speaking of the doctrine of notice, as applied to the law of mortgage, laying down the unqualified rule, “ that whatever puts a party upon enquiry amounts in judgment of law to a notice.” . It is however worthy of remark, that in the first class of cases to which reference has been had, where the greatest amount of evidence has been required to prove the notice, we uniformly find an effort made to give priority to an unregistered deed or mortgage, which was not only authorized but required by law to be recorded over one of the same or a similar character, which although subsequent in date, was in fact first recorded; and this is what has been termed, breaking in upon the statute, or doing-away, in the particular instance, with the registry act and its manifest policy, by a party thus attempting to excuse himself from doing that which the law required should be done. Some judges have regretted that the door was ever opened for letting in such proof at all; but the consideration, that without that, the law would often be used as an engine of fraud and oppression, has triumphed over these scruples. I will repeat, that this has been the case in every instance, where such great strictness has been required in the proof of notice. In those cases, however, where such notice as would' occasion enquiry has been held sufficient, no question arose in relation to the registry act, but the object generally sought to be attained was to give effect to a prior equity, which, by the law, the party was not allowed to record, so that lie was obliged to resort to other and less certain means to establish the notice. There may, indeed, be a reason why a party who can, by getting his title recorded, give notice to all the world of exactly the nature and extent of his interest, and neglect to do it, should be required to give stronger proof, when he attempts to establish notice, by another and less certain mode, than the one to whom the law has afforded no means of giving that universal and conclusive notice which the registry act affords. But as I have nowhere seen the distinction, which these cases would seem to indicate, laid down in terms, I do not feel authorized to present it as an undeniable proposition that the evidence of notice must be stronger where the proof of the notice is to support an instrument that might be recorded, than in other cases; especially where, as before remarked, the difference has been more in name, than iq reality, in most of the eases. So that after all, hereafter, as heretofore, each case must be governed by its own peculiar circumstances; and where the court is sat- [* 250] isfied, that the subsequent purchaser acted in bad faith, and that he either had actual notice, or might have had that notice, he had not wilfully or negligently shut his eyes against those lights, which, with proper observation, would have led him to acknowledge, he must suffer the consequence of his ignorance, and be held to have had notice so as to taint this purchase with fraud in law. It is sufficient if the channels, which would have led him to the truth, were open before him, and his attention so directed that they would have been seen by a man of ordinary prudence and caution, if he was liable to suffer the consequence of his ignorance. The law will not allow him to shut his eyes when his ignorance is to benefit himself, at the expeiise of another, when he would have had them open and enquiring, had the consequences of his ignorance been detrimental to himself, and advantageous to the other. As it is not pretended that Munson, at the time of the purchase, had personal notice- of the complainants’ interests it becomes necessary to enquire, by the application of these rules to the evidence, whether Mrs. Cutler, the avowed agent of Munson, had such notice ; for, if she had, it was constructive notice to Munson. 2 Powell on Mort. 581; 3 Atk. 646 ; Fonbl. Eq. 420 ; Principal and Agent 283; Story oh Agency 131, 140. But the attempt to charge Munson with Kimball’s knowledge cannot be sustained. Did the evidence show that Kimball, as the agent of Munson, negotiated the purchase, and that Munson subsequently recognised his authority, by adopting his acts, he undoubtedly would become as much his agent, by adoption, as he could have been by appointment. Story on Agency 245 ; Principal and Agent 286 ; 2 Powell on Mort. 584 ; 2 T. R. 188. But such is not the proof when the evidence is all considered. I am satisfied that the proper conclusion from the evidence is, that Kimball really had nothing to do with the matter, more than to ascertain at the request of Mrs. Cutler, the price which Teas placed upon the land and again, communicate to him her determination to take it. The part that Kimball performed was that of messenger, rather than negotiator. It would be hard to hold Munson responsible for Kimball’s knowledge, because he did this errand for Mrs. Cutler. He did not pretend to represent Munson, or to exercise any authority or discretion in the matter, but he simply performed an office, which would probably not have been required, had not the agent been a female. In order to make an adopted agency, the acts performed must be such as would make the agent responsible, if not assumed by the principal. Let us then see whether Mrs. Cutler had such information of Doyle’s prior equitable claim, as to have charged Munson with" personal notice, had he been aware of the same facts. Wood is the only witness who pretends to swear to any-[*251] thing definitely on the subject. He testifies, that in the fall or winter of 1834, he was doing business with Mrs. Cutler, in relation to her late husband’s estate, and that he then informed her of Doyle’s purchase, and advised her not to buy the land, which she was then negotiating for. On the other hand, Mrs. Cutler distinctly and positively denies ever having had any information or notice, from any source whatever, of Doyle’s-purchase or interest. The only possible way that we can reconcile these contradictory statements, consistently with the integrity of the witnesses, is to suppose that Wood’s memory is as treacherous as to the time when he had this interview with Mrs. Cutler, as it is in relation to the time when the contracts were made ; and he swears with as much confidence and as many circumstances, that both purchases were made in the summer or fall of 1834, which is the time he gives for his first acquaintance with Mrs. Cutler, as he does as to the time when he had the interview with her in relation to Doyle’s interest. It should be borne in mind that but three days intervened, between the sale to Doyle and the Munson. purchase, the one having been made on the 23d and the other on the 26th of May, 1835, and I think it no more improbable that Wood should be mistaken a few days as to the time of this interview, than it is remarkable that he should be mistaken from six to nine months as to the time when the contracts were made. But, let this be as it may, the most that can be said for the testimony ot Wood is, that it should be set off against that of Mrs. Cutler, and then we are left to ascertain from the other'evidence whether there is sufficient proof to fix notice on this agent. The only remaining testimony which goes to prove notice on Mrs. Cutler is that of Atchison, and he speaks only of indistinct recollections and vague impressions, without professing or pretending to give anything certain or satisfactory on the subject. He says that it is his impression that 'he had a conversation with Mrs. Cutler on the day that she purchased of Teas, and he thinks that in that conversation, the sale from Teas to Doyle was spoken of; but he says he cannot recollect any part of that conversation that he would be willing to swear to, nor does he know, he says, that Mrs. Cutler, at the time she made the purchase, knew of the sale to Doyle, but his impression is that she did. This is altogether too indefinite and unsatisfactory to be relied on, standing alone as it now does. The most that it can do is to raise a suspicion or remote probability that she may have heard of Doyle’s interest. Were the evidence satisfactory that she had heard of that sale before she purchased, from a source entitled.to any reasonable credit, and under circumstances not likely to be forgotten, I would hold that the duty had devolved upon her of tracing the matter out, and ascertaining its truth, to the same extent that she would have [*252] done had she been making the purchase for herself, knowing that she must suffer the loss, if she purchased the land when Doyle had an equitable interest. For the want of such proof, notice is not made good upon her. It now remains to be considered upon this branch of the case, what influence our recording laws have, because the complainants, having failed to make out a notice in any other way, unless our recording act helps them out, there is an end of the case. Our registry laws, unlike any other of which I have any knowledge, require that “all grants, bargains, sales, leases, releases,mortgages, defeasances, conveyances, bonds, contracts,or agreements, of and concerning any lands, tenements, or hereditaments, or whereby the same be affected in law or in equity, whether executed within or without this state, shall be recorded,” etc. (Gale’s Stat. 152) anda subsequent act, (Gale’s ’ Stat. 664,) provides “That from and after the first day of August next, (1833.) all deeds and other title papers which are required to be recorded, shall take effect and be in force from, and after the time of filing the same for .record, and not before, as to all creditors, and subsequent purchasers without notice, and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers without notice, until the same shall.be filed for record in the county where the said lands may lie.” No question can be made but that this agreement is embraced in the act first quoted, so that it was as much the right and the duty of Doyle to get this agreement recorded, as it was of Munson to place his deed upon record; and the effect of recording the agreement was precisely the same, so far as protecting his rights and interests was concerned, as it would have been had it been a deed. The agreement of the complainant is dated on the 23d of May, and is recorded on the 19th of June, 1835. Intermediate the date and recording of this agreement, on the 26th of May, the deed to Munson is dated, but it was not recorded till the 26th of June, seven days after the agreement was recorded. As the effect of a compliance with the recording act was to operate as constructive notice to all the world, that the object is as much accomplished by the recording' of an agreement as of a deed. What then would have been the effect on Munson’s title, had Doyle received a deed with date and record the same as the agreement ? Beyond all doubt, his deed being prior in date, and first on record, and bona fide, must take precedence of one subsequent in date and subsequently placed on record. The word subsequent, as used in the recording act, must have reference to the recording, and not to the date of the instrument, and such indeed is its literal and grammatical construction. As between .the grantor and grantee, the transaction is complete upon the execution and delivery of the deed; but as between the grantee and third persons, without notice, the purchase may be said not to be complete till the title paper is left for record. So here, as between [*253] Teas and Doyle, the purchase was complete such as it was, upon the execution and • delivery of the agreement, but as to third persons it was not complete, until the 19th of June, when the record was made ; and by the same rule Munson’s purchase was not complete till the 26th, seven days after. As Doyle completed his purchase, such as it was, first, he must be entitled to the benefit of his superior vigilance and earlier date. Let us look ’ at the consequences that would result from a different construction. Should we now postpone Doyle, because Munson is an innocent purchaser subsequent to the date of his agreement, then Munson would have to be postponed in his turn, should some one appear to-morrow, and produce a deed executed between the 26th of May and filie 26th of June, 1835, because, he would be a subsequent bona fide purchaser! Yes, subsequent to the date of this deed. Or, to make the absurdity of such a construction, if possible, still more palpable, had Doyle not made his purchase till a few days after the date of Munson’s deed, no matter when his agreement was recorded, then because he would occupy the exalted position of a subsequent bona fide purchaser, he would have been beyond the reach of danger, unless he was chargeable with notice, and the burthen of proving this notice would have been thrown on the other side. Having thus ascertained that Munson is liable to all the equities which the complainant can show himself entitled to under the agreement, we will now proceed to ascertain what those equities are ; and in this investigation we must first see what the agreement between the parties was, and whether it be such as a court of equity will enforce, or whether it be utterly void for uncertainty. A difficulty is presented in the outset, upon the mere perusal of the written agreement, in ascertaining what was the amount of the first payment, which was to be made on the second oi June. The whole consideration agreed upon is $1100, and the payments are to be made in a horse from the first to the tenth of July, and a “certain sum” was to be paid in hand, on the second of June, at which time a note was to be given for the balance, payable in fifteen months from the date of agreement. For the purpose of avoiding the apparent difficulties which the bare perusal of this agreement presents, the bill avers, that by the agreement of the parties, at the time, the first payment was to be $700, including the value of the horse, the whole of which Doyle had the option to pay in money, or to deliver the horse, according to the written agreement; and to support these averments, depositions were taken. No question can be entertained but that a portion of the aver-ments and the proofs in support of them, which are inconsistent with the terms of the written agreement, must be rejected ; and [*254] such is the averment which shows it optional with Doyle "whether he would deliver the horse or not. Whether it is competent for the complainant to determine and make certain by®paroi, that which is left uncertain by the agreement, is a question less easily settled. It is laid down as a general rule by most elementary’writers on the law of evidence, that a patent ambiguity, or an ambiguity which appears in the face of the writing itself, by the mere inspection of it, cannot be explained by parol evidence, while an ambiguity which does not appear on the face of the paper, but which is shown to exist by the intfoduction of parol proof, may be explained by the same class of evidence. In the practical application of these rules, great difficulty has been found to exist, insomuch that Mr. Justice Story (1 Mason 10) says there seems to be an intermediate class of cases partaking of the nature of both patent and latent ambiguities, as where words are used which have a settled meaning, but may admit of two- entirely different constructions, according to the subject matter in contemplation of the parties. And Mr. Justice Cowen, in Fish v. Hubbard, 21 Wend. 651, says: “lb is impossible to sustain this rule as laid down by Lord Bacon (Bac. Elm. Rul. 23), if we take ambiguity in its broad sense of doubtfulness, uncertainty, and double meaning.” And in Cowen and Hill’s notes, (3 C. & H. Notes to Phil. Ev. 1353,) the editors say on this subject: “It will not do to say, therefore, that a patent ambiguity, (meaning thereby an ambiguity appearing on the face of the agreement,) cannot be explained by evidence aliunde, though such .remarks are frequently found in the boobs.” And there are many cases to be met with, where such palpable ambiguities appeared on the face of the instrument that it was impossible to give the writing any definite meaning, without inquiring into the circumstances which the parties had in view, when they made the contract, where we find the courts calling to their aid parol evidence, to explain those circumstances, in order that they might give effect to the real intent of the parties. It is upon this principle that we see the English courts, at a very early day, that they might ascertain the real intent of a testator, where the language of the will was ambiguous, seeking evidence aliunde the will, and most frequently evidence of the amount and value of the testator’s estate. Foreman v. Points, Brown 472; Smith v. Doe, 1 Eng. Com. Law 22; Colpays v. Colpays, Cond. Eng. Ch. R. 210. But it is not in the construction of wills alone that this mode of ascertaining the intention of the parties has been resorted to; but we find the courts, in all cases, endeavoring by e’xtrinsic evidence, to place themselves, as far as possible, in the position of the contending parties, so that they may understand the language used, in the sense intended by the persons using it. Shortrode v. Cheek, 28 Eng. Com. Law 37, was as-sumpsit, brought on a guaranty, in which the words used [*255] were, “ you will be so good as to withdraw the promissory note,” etc. Now it is manifest, that both parties understood the expression, “the promissory note,” alike, and when it became a material enquiry, what was understood by the parties, by the use of that language, and for the purpose of showing what note was meant, the plaintiff was allowed to show that he held a note against the son of the defendant, in whose behalf the guaranty was undertaken, and thus the expression was rendered intelligible, while, without that explanatory circumstance, it was nonsense, from its apparent uncertainty. The case of Hodges v. Harford, 4 Eng. Cond. Ch. R. 349, was brought to compel the execution of a lease, and the agreement provided for the execution of a lease of the premises described, “ with the additions intended to be made thereto by Samuel Hodges, as per plan agreed upon; ” and the question was, whether the plan alluded to could be shown by parol, and in his decision, Lord Lyndhurst says: “As to the first point, I am of opinion, on the authority of all the cases, and especially the case of Clegman v. Cook, 1 Scho. & Lef. 22, where Lord Redesdale has considered the subject very fully, that as the written agreement refers specifically, to a plan, if there be parol evidence, clear and satisfactory, to identify the particular plan, that evidence may be properly admitted for the purpose of so identifying it.” Here, says Justice Cowen, was a case certainly of very great ambiguity apparent on the face of the instrument. It nowhere describes or points out the plan, or whether it was by parol or in writing, nor was it a case where one instrument could be used to éxplain another, for there the reference must be intelligible itself. This case goes a great way, and yet it was not lightly considered. I will only refer to one other late case to which allusion has already been made, and that is the case of Fish v. Hubbard, 21 Wend. 651, which was an action of covenant, brought on an instrument in which Hubbard had agreed to furnish Fish with water out of the mill dam, sufficient to carry the fulling mill and carding machine. At the trial, the plaintiff offered to prove that Hubbard owned a mill dam, a saw mill, and a grist mill, on the Oswego river, and that the plaintiff owned a fulling mill, clothing works, and carding machine a little below, and that neither of them owned other mills. This evidence the circuit court held inadmissible, and that the instrument was void for uncertainty; “and it .is clearly so,” says Mr. Justice Oowen,in delivering the opinion of the court, “ if we are bound to stop short with the reading of it, and cannot go beyond the face of the contract in search of its meaningbut the court Held the proofs admissible, for the purpose of showing what the parties intended by the use of ■ those indefinite expressions.. So it does not appear, by any means, a sufficient test for excluding parol proof, that it appears on [*256] the face of the paper that there is an uncertainty as to the meaning of the parties; but the true rule clearly deducible from the eases, I think, is where the language is of such a character as to show that the parties had a fixed and definite meaning which they intended to express, and used language adequate to convey that idea to persons possessed of all the facts which they had in view at the time they used the language, it then becomes the duty of the court to learn those facts, if need be, by parol proof, and thus, as far as possible, by occupying the place of the parties employing the expressions, ascertain the sense in which they were intended to be used. But if the language itself shows that the parties using it had no fixed and definite idea, which they intended to convey, then bringing the language in contact with no state of extraneous facts could enable the words themselves to convey a clear and definite idea, because, after all, it must be the language used in view of the circumstances, that conveys the meaning of the parties. • By the application of this rule, to this case, it is clear that the parol evidence here introduced, for the purpose of showing what the amount of the first payment should be, is entirely inadmissible. It cannot be said that it was offered with the view of showing in what sense the contracting parties used the words, “a certain sum;” because if they had really intended to express what it is said by this evidence, the contract in fact was, we never can be asked to believe that they would have used the words found in this agreement. Had the contract itself, or perhaps the circumstances in view of both the parties, referred to any means for determining the amount of that first payment, such as a certain sum which may be sufficient to pay the debt which I owe A B, or which may be sufficient to buy the farm of C D, it would have been competent for the court to go to the sources of information thus referred to by the instrument itself. But that is not this case. Here the parties have used language which indicates that they had come to no definite and certain agreement as to the amount of the first payment; but it would seem, from the expressions used, that that part was left open for subsequent negotiation, or to be determined by the discretion of one or the other of the parties. If the amount was in fact agreed upon, the irresistible conclusion is that they would have stated it in the agreement, and not used words, which, by no possible construction, nor by any possible explanation, could convey their real understanding. But it was said that this parol proof was not incompatible with the language used; but if it be contended that the use of this evidence was tc give effect and -meaning to-the expression, it maybe replied that it gives a meaning that the words cannot possibly convey. But it was urged with great earnesttiess, on the argument, that what merely goes to the discharge or mode of performance may be proved by parol, and hence the admissibility [*257] of this evidence. But this is not true to the extent contended. When the place of payment is not specified in the writing, the law fixes, by its intendment, where the payment shall be made ; but as that place is fixed, not so much because it is certain that the parties agreed upon it as because it is necessary that some certain place should be fixed, if it can be ascertained in any satisfactory way that the parties intended the payment should be made at any other place, it may be there made. On this subject, in the ease of Brent et al. v. The Bank of the Metropolis, 1 Peters 89, which was a suit on a promissory note, Chief Justice Marshall says : “ But this is not an attempt to vary a written instrument. The place of the demand is not expressed on the face of the note, and the necessity of a demand on the person, when the parties are silent, is an inference of law which is drawn only when the parties are silent. A parol agreement puts an end to this inference, and dispenses with a personal demand. The parties consent to a demand at a stipulated place, instead of a demand on the person of the maker, and this does not alter the instrument, so far as it goes, but supplies extrinsic circumstances which the parties are at liberty to supply.” But this is far short of what the complainants are here seeking; and. the case of Small v. Quincy, 4 Greenl. 497, is directly against the proposition contended for. There it was held that where a written agreement was payable in money, it was inadmissible to show, by parol proof, that it was agreed, at the time of making the writing, that if the promissor, within a given time, delivered a certain quantity of cotton, it should satisfy the agreement. Indeed, it is manifest that the mode of discharging an. agreement or satisfying an obligation is as essential a part of the contract as any portion of it. On the whole, then. I am clearly of opinion that the parol proof which is here introduced for the purpose of fixing the amount of the first payment is inadmissible, and that we cannot go beyond the contract to ascertain that amount. The.question then arises, does the neglect of the parties to fix any definite sum as the amount of the first payment leave the contract so uncertain as to make it absolutely void, so that neither party could enforce it against the other ? I think it does not. Such a construction would do violence to the manifest intention of the parties, and should be avoided if possible. And in this connection it may be proper here to consider another objection that was raised to the validity of this agreement; and that is that Doyle, by it, has assumed no responsibility, and consequently Teas is not bound by it. If the premises were correct, the conclusion might follow; but such is not the ease. It is not necessary that both parties should, in the body of the agreement, in express terms, assume to contract, but it is sufficient if [*258] the instrument show a manifest intention on the part of both the parties who have signed it to assume the responsibilities therein assigned to them, as in this agreement. Here Teas agreed to sell the land in question to Doyle for $1100, to be paid in a horse and a certain sum of money on the 2d of June, “and the said party of the second part to give his promissory note for the balance,” payable in fifteen months, and concludes, “ In testimony we have hereunto subscribed our names and affixed our seals this 23d day of May, A. D. 1835,” and is signed and sealed by both the parties. To say that this was a mere idle ceremony, intended to have no binding efficacy on either party, or to say that it was a mere naked proposition from one party to the other for his consideration, to be thought of and acted upon as either party might see fit, at some subsequent time, is not only doing violence to the language-of the contract and manifest intent of the parties, but to the urgent dictates of common sense. But here both parties have entered into the contract by which each intended to be bound, the one to execute the deed and the other to pay the $1100 in the manner specified ; and as before remarked, it is the duty of the court to give effect to this contract, if possible, rather than to say that the parties meant nothing by all they did. Suppose that Teas were the party complaining here, and showed us that at the expiration of the fifteen months he had tendered his deed, would it lie in the mouth of Doyle to say he would never pay anything, because it was not clearly stated liow much the first payment should have been, notwithstanding the last payment had become due ? Such a de-fence, I apprehend, would find but little countenance in this court; and yet if Doyle could have been made liable on this agreement, by strict punctuality on the part of Teas, that reciprocity of obligation, which the law will maintain, must enable Doyle, by strict punctuality on his part, to make Teas liable. What would amount to punctuality on the part of Teas we have no difficulty in ascertaining ; but what it was necessary for Doyle to do, to live up strictly to his part of the agreement, may be a question admitting of more doubt, and that difficulty alone consists in determining from the agreement the amount to have been paid on the 2d of June. Had the contract provided that Doyle should deliver the horse and pay in hand some money on the 2d of June, and give his note for the balance, it would be quite manifest that the amount of money to be paid in June would have been left optional with Doyle, and had he paid but a nominal sum he would have been within the provisions of the contract; and yet by introducing that change into the phraseology of the agreement, but little if any change would be made in its sense. A certain sum of money, although entirely uncertain and indefinite as to the amount, is no moró'so than some money. Any amount, when once told, is some money, and so, also, a certain sum. Let us apply other [* 259] and perhaps surer test, and see if we don’t arrive at the same result. Had Doyle neglected or refused to make any payment or tender on the 2nd of June, a cause of action would have accrued to Teas for that delinquency, and his measure of damages would 'have been, the certain sum of money mentioned in the agreement. I do not see how he could recover in such an action more than nominal damages. If we go above a nominal sum, and say $100, we may with the same propriety, say 1500, or $1000, or any other sum within the entire amount. If, in such a suit, Teas could onty recover a nominal sum, then Doyle was only bound to pay a nominal amount; because Teas could recover all that Doyle was bound to pay. I think there is no hazard in saying, that Teas, by neglecting to fix any given amount for that”payment, in the agreement, when lie liad it in his power so to do, must be taken to have left that amount to the discretion or convenience of Doyle. If it should be said that this is taking a contracted view of . the intention of the parties, and that something more than a nominal sum must have been meant, I do not see how such an objection can be made out from the language of the agreement. We will now examine more particularly the question of performance on the part of Doyle, and see if he has substantially brought himself within the provisions of the agreement in other respects; for, unless he has, or shows some sufficient excuse for his default, he cannot expect to recover. In addition to the money payment which was due on the 2d of June, a sufficient tender of which, as we have already seen, was made, the agreement provides that he should pay a horse from the first to the tenth of July. This was a material obligation imposed upon Doyle, which it was his duty to perform specifically, unless he could render some sufficient excuse for his failure. For aught Doyle knew, or for aught we know, it may have been important for Teas to have had the horse at the time agreed upon, and Doyle had no right to presume that the value in money would answer Teas as well. We cannot learn, from the contract, whether this provision was inserted for the particular benefit of either party. It may have been for the benefit of both, and each had a right to insist on its observance. No tender or offer of the horse is pretended, and for an excuse the bill avers, that at the time the contract was entered into, the parties agreed that the amount of the June payment should be $700, including the value of the horse, and “ that it was further understood and agreed, that at the time and place aforesaid, it should be at the option of Doyle to pay over the whole of the said sum of $700, or to assess or cause to be assessed or agreed between the parties, the price or value of said horse, which was to be delivered to Teas, [*260] from the first to the tenth of July.’’ We have before seen that evidence in support of this averment is inadmissible, and most especially so is that part, which attempts to show that it was optional with Doyle, whether he should deliver the horse or pay his value in money. This was an attempt not to explain or illustrate the sense in which the parties intended to use the language of the agreement, but an attempt to change and alter its sense, and show a 'repugnance between the agreement as understood by witnesses, and the language used in the paper. This will not do. But even admitting it, there is a manifest failure in the attempt to sustain this averment by the parol proof; for that shows an agreement not only widely diffeient from the written contract, but differing quite as widely from this averment in the bill. Walby, who is the only witness who pretends to have been present when the contract was made, says, “ The price for the two pieces of land agreed on was $1100, and the payments as follows; — $800 on the 2d of June following, and the balance in fifteen months from the date of the contract.” “ The parties agreed that the payment of $800 should be made at McFadon’s store, on Bear Creek, in Adams county, on the 2d of June, 1835.” This is all that Walby says as to the nature of the agreement, and all that has a tendency to show any different agreement from the one set out in the bill, as reduced to writing. This testimony shows the amount of the first payment to be $800 instead of $700, as is averred in the Bill; and not a word is said about the horse, one way or the other; but by this we are told that the whole was to be paid iñ money, at all events. So far then from this evidence throwing any satisfactory light upon the nature of this contract, it shows conclusively that the witness knew but very little of what the parties did agree to, and forcibly illustrates the wisdom of the rule by which it was excluded. If this proof were admissible, and taken as conclusive, it would show a very good reason why the horse should not have been delivered, but as it is, a very different reason from that set up in the bill; for that reason also it is inadmissible, for in this court, as in a court of law, such proof is only proper which is pertinent to the issues, or has its foundation in the pleadings. It must not differ from them; Then here is a failure without an excuse. That circumstances might have existed that would have superseded the necessity of a tender of this horse, under this agreement, I have no doubt. Thus, had Doyle averred and shown that the horse had died before the time for delivery had arrived, or perhaps had Teas, after the making of the agreement, waived the delivery of the horse, and agreed to receive the whole in money, a sufficient excuse might have been made out. Williams v. Hyde, Palm. 548. Again it is provided in this agreement, that Doyle should execute his note to Teas on the 2nd of June, payable fifteen months from the date of this agreement, for the balance, [*261] which should remain due after deducting the payment of the 2nd of June, and the value of the horse; which was not .•done, nor any apology offered for the omission. This may have been of more or less importance to Teas, according to his peculiar circumstances. It might have been of great importance to him. •to have had that note, to get it discounted, or otherwise put it in circulation, and thus realise the proceeds immediately'; and as his agreement called for it, he had a right to demand it, and he now has a right to insist on the objection that it was not tendered. It was the duty of Doyle to see to it, that he did everything that he had agreed to do, if he intended to put Teas in default. Nor does it appear that Doyle has kept his tender of $800 good, as the law terms it, subject to the order of Teas, and by bringing it into court to be disposed of, as the court might direct. Bronson v. Howley, 2 Lord Raym. 82; Giles v. Hartis, Ibid. 254; Jackson, ex. dem. v. Low., 5 Cowen 248. I will not now say that any one, or even all of these delinquencies on the part of Doyle are of such vital importance as to be beyond the reach of the discretion of the court of equity, but they are of such a character, at least, as to render it -.proper that they should be taken into the account of the sum of his defaults. And next comes the final payment of the last of the consideration money, which, by the terms of the agreement, was to have been made on the 28d of August, 1836, fifteen months from the date of the contract; and no payment or tender bf this is pretended. As a reason why the payment was not made, it was insisted on the argument, and with great apparent confidence, that inasmuch as Teas had parted with his title to Munson, before the first payment became due, and had thus incapacitated himself from performing on his part, Doyle was discharged from performing, as he had agreed, because it was impossible for him thereby to get his title from Teas; and that equity will require no useless act to be done. This proposition being one of importance as here presented, as it must form the pivot, after all, upon which the question of performance on the part of Doyle must turn, it certainly requires a .most careful investigation, and we will therefore proceed to examine the authorities by which it is attempted to be maintained. The first case to which we are referred is Jones v. Barkley, Dougl. 684, where the question arose on a demurrer. The suit was brought on a covenant to pay ¿£611, upon condition, among other things that the plaintiffs would assign, within a given time, the equity of redemption in certain stocks; and the declaration averred that they, within the time, “ offered to the defendant to assign etc., and offered to execute the assignment,” “but [*262] that the said defendant then and there absolutely discharged the plaintiffs from executing the same and this Lord Mansfield held to be a sufficient excuse for not averring that the equities had been actually assigned. And well he might, for the case showed an offer to perform on the part of the plaintiffs, and an absolute discharge from the Derformanee on the part of the defendant. The next is the case of Hotham v. East. Ins. Co. 1 Term. R. 639, which was a motion in arrest of judgment, on a verdict for the plaintiff for short tonnage. The charter party contained a clause that short tonnage should not be allowed, unless the same should be certified by the president or agent of the defendants, etc. Plea, that the president or agent’s certificate- was not obtained. Replication that they were requested to certify and refused; and it was held by the court, that the refusal of the president and agent was equivalent to the refusal of the defendants themselves, and that they should not thus take advantage of their own wi’ong. 'Mr. Justice Ashurst.says: “It is unnecessary to say whether the clause relative to the certificate be a condition precedent or not, for granting it to be a condition precedent, yet the plaintiffs have taken all proper steps to obtain the certificate, and it being rendered impossible to be performed by the neglect and default of the company’s agents, which’the jury have found to be the case, it is equivalent to performance.” In Sir Anthony Mayne’s case, 5 Coke 21, the second resolution of the court was this: “ If a man seized of lands in fee, cove-nanteth to enfeoff J. S. of them, .upon request, and afterwards he make a feoffment in fee of the lands ; now in this case J. S. shall have an action of covenant, without request, and this is the principal ease.” Had Doyle brought an action of covenant against Teas, to recover damages on the agreement, before the expiration of the time of payment, then might .this case have been entitled to great consideration. The case of Bowdell v. Parsons, 10 East 359, decides that where the party agreed to deliver on demand, a certain stack of hay to the plaintiff, and afterwards sold it to another, the plaintiff might bring his action for damages, without a particular request. And this is in principle the same as the case in Coke. In the case of Amory v. Broduck, 5 Barn and Ald. 712, the defendant had sold to the plaintiff a bond, and covenanted not to receive anything on it or make it void, but that he would avow, etc., all suits upon it, and afterwards executed a release to the obligor, and the court held as the release would operate to defeat a suit on the bond, it amounted to a breach of the covenant. Holden v. Eaton, 7 Pick. 15, was a suit against a collector for not returning a tax sale to the clerk’s office, so that the purchaser could get his deed. The court held that the plaintiff was not bound to demand a deed of the clerk, because one [*283] could not have been issued for want of the return. In Fleming v. Gilbert, 3 Johns. 528, it was held that in an action upon a bond, the obligee .might show by parol, in his defence, that the obligor had discharged him from a literal compliance with the condition, where his performance was not complete. In the case of the Bank of Columbia v. Hagner, 1 Peters 450, the plaintiff sold to the defendant a piece of land to be paid for, and the deed to be delivered at a certain time, neither of which was done. Long after, the plaintiff tendered a deed and sued for the purchase money, and the court held, that he should have tendered the deed on the day, unless “before the period had arrived, when the deed was to be delivered, the defendant had declared he would not receive it, and that he intended to abandon the contract; it might have dispensed with the necessity of a tender, as the conduct of the defendant might, in such case, have prevented the act from being done, and he who prevents a thing from being done shall never be permitted to avail himself of the non-performance which he himself has occasioned.” The case of Williams v. U. S. Bank, 2 Peters 96, shows that where the endorser of a note prevents the holder from giving him notice of non-payment, by absenting himself from his house, and. locking it up, the holder is excused from proving strict notice. The case of Cathcart v. Robinson, 5 Peters 264, was where the defendant resisted a specific performance of an agreement to purchase land, on the ground that he had a right to relieve himself from the purchase by the payment of $1000, and it was objected that the money had not been tendered, and the court says: “ It was perfectly understood that Robinson (the complainant) would not receive it,' (i. e. the $1000,) and the only fund from which it could have been raised, the Spanish claim, was bound to him. The court therefore does not perceive in the conduct of Mr. Oath-cart sufficient cause to overrule his defence.” And in this case the difference is clearly recognised by chief justice Marshall, between the case to be made out by the defendant to enable him to resist an application for a specific performance, and the case which he should make out, were he the complainant seeking a performance from the other party. The latter must be a much stronger case than the former. In Delamater v. Miller, 1 Cowen 75, the defendant was bound to deliver a watch to the plaintiff on request, and then parted with the watch to another, and the court held it unnecessary to prove a demand. Greenly v. Cheevers, 9 Johns. 126, was this case: The plaintiff purchased of the defendant certain premises, which were to be paid for by installments, and the agreement was, when one [*264] half was paid, a deed with a clear title was to be given. The plaintiff paid a part, but before the balance of the half became due, and without tendering it and demanding his title, he sued for what he had paid, alleging that the premises were encumbered with a heavy mortgage, but the court held that he could not rescind the contract at that time, and said: “ If Oheevers had waited till half of the purchase money was due, and then had offered to pay it on receiving a deed, and Greenly had then been incapacitated to convey, by the outstanding mortgage, which he had omitted to redeem, there might have been grounds to consider the contract at an end and rescinded.” This case is very far from supporting the doctrine contended for by the complainants here. If it has any application at all, it is against it; and t lie case of Robb v. Montgomery, 20 Johns. 15, is fatal to the position for the support of which it is cited. . There the parties had entered into an agreement for the sale of some land, which was to be paid for by installments, and a deed was to be given on the payment of the first installment, if the defendant wished, by securing the .balance by bond and mortgage on the premises, and the suit was brought, for the purchase money, and the defence was that after the sale, and before the first installment became due, the plaintiff had sold and conveyed the said premises to one Bemis, who it appears stood ready to convey, on the payment being made. In deciding that case, chief justice Savage says: “ Where the payments are to precede the conveyance, it is no excuse for non-payment, that there is not a present existing capacity to convey a good title, unless the one whose duty it is to pay offers to do so on receiving a good title, and then it must be made to him, or the contract will be rescinded.” In the same case, the chief justice says: “In the view of a court of equity, Bemis was a mere trustee for the performance of the contract. Under the facts in the case, lie-might be compelled to execute a deed to the defendant, when the latter entitled himself to one by the payment of the purchase money.” In the case of Harrington v. Higgins, 17 Wend. 376, it was held that where, by an agreement for the sale of land, to be paid for by installments, one of which was to be made before the time expressed for the conveyance, that it was no defence to an action for the first installment, that the vendor had not the title at the time that installment fell due. And the court here also recognize the same rule as laid down in 20 Johns. I have thus adverted to, and given the substance of all the decisions in support of the proposition that Doyle was absolved from his obligations of punctuality, or even performance at all, under the agreement, because Teas had in the mean time parted with his title to Munson. Some of these cases show that when one party refuses to perform, or declares that he will not perform,-or incapacitates himself to perform, the covenant is broken or agreement violated, for which the other party may have his action, sometimes [*265] without an offer to perform on his part, or demand on the other, and sometimes by offering to perform, dependingjjin a great degree on the dependence or independence of the covenants; or, if he chooses, he may consider such a breach a rescinding of the contract, and may treat it as at an end, and so be absolved from further obligation to perform. In attempting to apply these principles to the case before us, the difficulty all along has consisted in this: The counsel have confounded the two remedies, which a party may have on an agreement for the conveyance of land, to one of which the position assumed might be correct, to the other it clearly is not. One of these remedies is an action on the agreement for damages, to which one party may be entitled as soon as the other has in any way violated the contract, unless indeed he has invited that violation, by a previous breach on his part. Thus, for the present, laying out of view the question of dependent or independent covenants, which might be raised in this ease, Teas, by selling the land to Munson, before the second of June, when the first payment fell due, was, according to the case of Sir Anthony Mayne, guilty of a breach of his agreement, for which Doyle had a right to sue him immediately, or he might, if he chose, consider the conveyance as a renunciation of the contract by Teas, and byre-fusing or neglecting to comply on his part, with the agreement, treat it as at an end. This sale by Teas to Munson may be a very good excuse in the mouth of Doyle, why he did not comply on his part, for some purposes, while it is no excuse for others ; and all this must depend on the position which he occupies in the controversy. Thus if Teas had sued Doyle for the purchase money, or "for not delivering the horse, Doyle could with great propriety have turned around and replied : True it is, I have not ■ kept my covenants, but the reason is, that you have violated yours first; but because this may'serve as a shield, it is not necessarily a sword. In this court, where a specific performance is sought, it is not sufficient alone to show the adverse party in default, but the party complaining must show that he is not liable to the same imputation, or in other words, the complainant must come into court with clean hands. By seeking a specific performance of this agreement, the complainant treats it as a subsisting valid contract, obligatory not only upon Teas, but also on Munson, his grantee. He now says he did not pay the money, as he had agreed, because the title had gone beyond his reach, and the tender would have been a useless ceremony; but by bringing this suit he affirms that the title is not only now within his reach, but that it has always been so, and must hence necessarily contradict the very excuse which he offers. By seeking a title under [*266] this agreement, through the medium of Munson, into whom it has passed, he must treat him not as the honafi.de grantee of Teas, but as his trustee, who is not only authorized but may be compelled to make the title for him, and thus fulfill his covenants. And if Doyle chooses thus to treat Munson, as the trustee of Teas, to make this conveyance, he cannot well deny that either Teas himself, or Munson, his trustee, had a right to receive the purchase money. Or, perhaps, if he chose, he might in this proceeding treat Munson as the assignee of this agreement from Teas ; but if so, he must admit that Munson succeeded to all of his rights as well as liabilities, and hence, in equity, at least, entitled to recover the purchase money. By assigning Munson the first position, the tender to Teas was safe, and in either case it was good to Munson. If Munson was Teas’ trustee to make the deed, he was also his trustee to receive the money. By bringing this suit he claims to be entitled to a deed ; and now let me ask where did that title first accrue? Was he entitled to it on the second of June, when he tendered the $800? Certainly not; because although no time was fixed in the agreement for the delivery of the deed, yet the law allowed the defendant to retain the legal title till the time the last payment became due, as a security for the purchase money., McCoy's Adm. v. Baxter's Adm. 6 & 7 Ohio Cond. R. 134. Did he become entitled to a deed at the end of the fifteen months? That can hardly be said, because Doyle had done nothing more at that time to entitle him to it, than he had on the second of June. And now on the first of July, 1837, when this bill was filed, nearly a year after he agreed to complete the payments, had the complainant’s rights to demand a deed accumulated any strength? He had done no act to strengthen them, but on the contrary had slept upon those rights, whatever they were, still retaining the purchase money. And if he could not, on the twenty-third of August, when the last payment became due, say to the defendants give me a deed, without tendering them the balance of the purchase money, and by keeping the first tender good, which I presume would hardly be contended, (2 Johns. Cas. 441,) then he could not make the same demand on the first of July, 1837, without at least, making the same tender ; and if he did not, before he had filed his bill, clothe himself with a right to demand a deed, without anything further being done on his part, then’he had no right to demand a deed of this court. We can only compel a party to act when it was his duty to act without our interference. I would not be understood as saying that this payment must have been made at all events on the very day that it fell due, to have entitled the complainant to the relief sought; for undoubtedly the court has a discretion, in an application of this nature, to disregard the exact time as not so indispensably essential as to prevent the court from looking further, when it sees that the payment was not made at the very day ; but then, if the day has long passed, some [* 237] satisfactory excuse for the failure must be shown to exist, and in such a case, if any damages have arisen to the defendant from the delay, the court will award him a compensation for it.. For the sufficiency of this excuse, each case must depend upon its own peculiar circumstances. We were admonished of the hardship of requiring of Doyle to pay to Teas the $1100 when it became due, because in case he should prove irresponsible, he might lose his money, and never get his deed. But that hardship does not exist, for the danger is not incurred. It was his duty to tender the money, and at the same time he had a right to demand the title for which he had contracted, and till he could see that title, he was not bound to pass over the money, and by holding that money in readiness, he would have occupied a position which would have enabled him to demand his deed at any moment, and which would have' given him a right, within any reasonable time, to resort to a court of chancery, deposit his tender with the clerk, and ask for a deed. But tbis lie lias not done in whole or in part. He did not “ wash his hands in innocency ” before he came here, but, instead, we hud him guilty of as much negligence as he lays fraud at the door of the defendants. If Teas had disregarded 1ns contract by selling to Munson, Doyle, too, has acted as if there were no agreement, by making no payment when all was due. Both have treated the contract as at an end. The law cannot allow Doyle to say, “ I will keep my money and will disregard my contract, because I cannot get a deed under it;” and at the same time come into court and say, “ Make them give me a deed because they are able.” That would be a disregard of consistency which cannot be tolerated. I am not prepared to say that a case might not exist, where the great uncertainty, as to whom the tender should be made, or possibly, the great trouble, expense, and inconvenience, necessarily attendant upon an effort to make an effectual tender, where a personal tender might be'dispensed with, and the money brought into this court, with a bill for a specific performance; but in such a case delay could not be tolerated, so as to allow the party to speculate upon the advantages of his bargain. There no delay could be allowed, otherwise the party might lie by till he finds the property doubling, or thribbling, or, as in this case, increasing in value a hundred fold, as the testimony is, and then when he finds a magnificent speculation before him, present himself to assert a claim which would never have been heard of, had the property decreased in value. I have before stated that it was not only necessary that the proper tender should have been made, but also that tender must be followed up by bringing the money into court, and depositing it, not according to the English practice, with the register, but according to our practice, with the clerk. And in requiring ["* 268] this to be done, this court follows the same rule with the courts of law, where, if a tender is pleaded, the party is required to bring his money into court, and it is for the same reason substantially, that by accepting the tender an end may at once be put to the controversy. There are, however, other reasons why, in this court, a tender is required to be brought into court, but it is unnecessary to advert to them now. We have seen then, both upon principle and authority, that the complainant stands without excuse, for his defaults, thus leaving his conscience as much affected as the defendants’ can be, and he must be therefore left without relief. Several other minor questions were raised and discussed with great ability on both sides; but as what have already been considered must necessarily decide the case, it is unnecessary to go further. Nate. In this case the court directed, on motion of the counsel for the complainants, that the expense of printing the abstracts of the case should be taxed in the bill of costs, by the clerk, although they were not furnished by him, but by the parties. The decree of the circuit court is affirmed; but no costs are allowed to either party. Wilson, Chief Justice, said: In this case I concur in the judgment of the court affirming the judgment of the court below. Lockwood, Justice, delivered the following separate, opinion: The bill filed in this cause was for a specific performance., and as I do not concur in some of the points discussed in the opinion of Mr. Justice Catón, I briefly state the ground on which I concurred in affirming the decree rendered by the court below. I am of opinion that the written contract set out in the bill is too uncertain, as to what the respective parties were to do, to justify a court of equity in decreeing a specific performance of it. I express no opinion whether by the parol contract also set out in the bill, it was competent in that manner to render the original contract sufficiently certain, to justify a decree for a specific performance; because I am of opinion that the proof does not sustain the parol contract. Because, then, the original contract is uncertain, and the allegations and proof of the parol contract do not correspond, I am of opinion that the decree below was properly affirmed. Decree affirmed. This cause was decided at the last term of the court, but the opinion was not delivered till this term.