## FISH *vs.* HUBBARD'S ADMINISTRATORS.

Where by a written agreement one party agreed to furnish another with water out of *the mill-dam* sufficient to carry *the fulling mill* and *carding machine*, and at all times to have such a share of the water as would be sufficient to carry one wheel, when either of the wheels of *the grist mill* and *saw mill* were running, without any description of the location of the dam or mills, or allusion to the ownership of the same : IT WAS HELD, in an action brought by the party who by the terms of the agreement was to be furnished with water, on a motion for a new trial, he having been nonsuited, that *parol evidence* was admissible to show the *location* and *ownership* of the dam and respective mills, in reference to which the agreement was made to show that the party granting the privilege was, at the date of the agreement, the owner of a *mill dam*, a *grist mill* and *saw mill*, and that the other party at the same time was the owner of *a fulling mill* and *carding machine* in the vicinity of the other mills and dam, and that the respective parties owned *no other mills or dam*.

The above decision was made on the assumption that the declaration in the cause contained *averments* to which the proof offered would apply.

The rule of Lord Bacon, that " *ambiguitas patens* is never holpen by aver-ment," considered and commented upon ; and the doctrine advanced that the rule is necessarily subject to qualification, and has been so adjudged in a variety of cases referred to.

THIS was an action of *covenant,* tried at the Oswego circuit in November, 1838, before the Hon. PHILO GRIDLEY, one of the circuit judges.

The action was commenced on a contract under seal executed by the intestate, *Norman Hubbard,* in these words: " This agreement, made this 12th February, 1822, between Norman Hubbard of the first part and Adam G. Fish of the second part, both of Volney, county of Oswego and state of New York, witnesseth, that the said party of the first part, for and in consideration of the sum of fifty dollars to me in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, do agree to furnish the said party of the second part with *water out of the mill dam* sufficient to carry *the fulling mill and carding machine* at all times, except either in drought in summer or the usual times of freezing in winter, and at all times to have such a share as is sufficient to carry *one wheel* when either of the wheels of *the grist mill and saw mill* are running.; and further, if the said party of the second part should wish to use more water than for the true purposes above mentioned, he is to have the privilege at all times when the water is such that it will not interfere with *the other mills.* (Signed) Norman Hubbard, L. s." The defendants pleaded *non est factum* and other pleas, and also gave notice of special matter to be proved on the trial. The plaintiff read the above instrument in evidence, and *offered to prove* that at the date of the agreement Norman Hubbard owned *a mill dam, a saw mill* and *a grist mill* on the Oswego river in the town of Volney, and that the plaintiff, Aaron G. Fish, owned *a fulling mill* and *clothing works* and *carding machine* a little below the mills and dam of Norman Hubbard, and that Hubbard and Fish owned *no other mills or dam ;* and also offered to prove a breach of the covenant and the

damages sustained thereby by the plaintiff. The counsel for the defendants objected to the admission of such evidence on the ground that it was inadmissible to give *parol evidence to explain the agreement* and show *what dam* and *what mills* were meant by it—that a *patent ambiguity* cannot be explained by parol testimony. The circuit judge sustained the objection and *nonsuited* the plaintiff, who now asks for a new trial.

*J. A. Spencer*, for the plaintiff.

*B. Davis Noxon*, for the defendants.

*By the Court*, Cowen, J. The learned judge at the circuit, thought the description of the property in the covenant so entirely uncertain, that the instrument was inoperative and void. And it is clearly so if we are bound to stop with reading it, and cannot go beyond the face of the contract in search of its meaning. Were this a will, or deed conveying land, and the reference to the mill dam, carding machine and fulling mill, were used as description of parcels, then it is clear that in its own nature it would refer to some subject matter, in respect to which we must look out of the instrument, and locate and apply the description if in our power, upon what is called extrinsic evidence. And if it were in proof, that the devisor or grantor owned one mill dam, one carding machine, and one fulling mill, and no other property of that description, at the date of his will or deed, ought we to hesitate in saying that he intended to pass such property? or, should we say that, possibly he might have intended some property of his neighbor or neighbors, answering a similar description? A location or application of the description of parcels, must always be made by evidence *aliunde;* and it seems to me, that the mind could be left in no more doubt upon such evidence, as to what property was intended, than if it had been described with the fullest accuracy. The instrument would be of a nature to pass the *devisor's* or *grantor's* property, and that alone. This he would know; and he would also know

that that was the only property to which the description could be applied.    According to the primary meaning of the language, nothing would be described.    But it well might have a secondary meaning growing out of extrinsic circumstances.    It is said, here is a *patent* defect of language, coming within *Bacon's* rule as to ambiguities, which cannot be helped by averment.    But words canot be denominated uncertain or ambiguous, because the court which is called upon to explain them, may be ignorant of a particular fact, art, or science, which was known to the person who used them.    Wigram on Extr. Ev. 130.    Nollekens, the sculptor, made a codicil thus : " Memorandum—all the marble in' the yard, the tools in the shop, bankers, *Mod*, tools for carving, the rasp in the draw, &c., shall be the property of Ales Goblet."    No one could read this as necessarily meaning the testator's property ; yet no one thought of questioning that the codicil was meant of what he himself owned.. But above all, the judge could not say that *Mod* meant any thing.    And he ordered artists to be examined. They explained the meaning.    It was found to signify a certain sort of property which the testator owned, amounting to £700.    *Goblet* v. *Beechy*, Wigr. on Extr. Ev. 139, App. 3 Sim. 24, S. C.    This cause was successively before Sir John Leach and Sir Launcelot Shadwell, and I am not aware that, in any stage of the cause, the propriety of receiving explanatory circumstances was at all doubted. The decision of Sir L. Shadwell, was afterwards reversed by Lord Brougham ; but Mr. Wigram says the decision did not affect this question.    Wigr. on Extr. Ev. 134, 135, 156.

Again : it is the duty of the court to make a will or deed effective if possible.    *Ut res magis valeat quam pereat.*    A man devises all his real estate ; and, on inquiry, it is found that he owned none at the time ; but he had a power of disposition over the land of another.    It has been held that the words " my real estate," shall apply to and pass such as he had the mere power to devise.    *Lewis* v. *Lewellyn*, 1 Turn. Ch. R. 104, and see *Standen* v. *Standen*, 2 Ves. jun. 589, and *Napier* v. *Napier*, 1 Sim. 28 ; Wigr. on Extr. Ev.

Fish v. Hubbard's administrators.

30. The broad principle on which these cases go is, that the will must, if possible, be made operative. A testator devises all his lands in a particular county ; he owns some land there, and over others he holds a mere power. The latter shall not pass, because there is enough beside on which the will, in its direct and primary sense, may take effect. But if there be none there, but the lands subject to a power, although in no legal sense can such lands be called his, yet the will shall operate. *Napier* v. *Napier*, 1 Sim. 28. In applying the principle, we see that the courts take up the words of the will, which they discover cannot be satisfied according to their legal import. The words there stand entirely indefinite and uncertain, until the court find, on casting about, that there is certain land which the testator might have devised or conveyed in another form ; and that these are the only lands upon which the instrument can operate ; and they give the words a direction and application to that land. Take the language of Best, J. in *Lewis* v. *Lewellyn*. He says : " *Ut res magis*, &c. That is the general principle of *Standen* v. *Standen ;* and we must look only to the general principle, for it is impossible to find two cases alike. The principle is, that where there is nothing for the will to operate upon, but with reference to the power, it must operate as an execution of the power." And may we not say so in respect to the covenant before us ? There was nothing in the state of the case, as proposed to be made out by evidence, on which the covenant could operate, except the dam and pond of the defendant's intestate, and in favor of the carding machine and fulling mill of the plaintiff ; for the defendant's intestate owned no other dam and pond ; the plaintiff no other machine and mill.

I have so far adverted to the doctrine upon wills and other assurances of title, and, in principle; I can perceive no difference between the method of applying a description of parcels in such instruments, and that which we are to adopt in ascertaining the subject matter of an executory agreement. Indeed, a question arose in the late case of *Shortrede* v. *Cheek*, 1 Adolph. & Ellis, 57, the decision of which would seem to go the whole length of sustaining the ground taken

by the plaintiff in respect to the covenant in question. Cheek, the defendant, on the 11th of May, 1832, wrote to Shortrede, the plaintiff, thus : " Sir, you will be so good as to withdraw *the promissory note,* and I will see you at Christmas, when you shall receive from me the amount of it; together with the memorandum of my son's, making in the whole £45." It was agreed that this was a contract which, by the statute of frauds, it being to answer the debt of another, must therefore be sufficiently clear and certain on its face, to show a consideration and a subject matter. In order to make out both, the plaintiff at the trial introduced a variety of extrinsic evidence. He proved that at the time, he held a note of £35 against the defendant's son, dated January 28th, 1832 ; and a letter subsequent to the guaranty, (of January 10th, 1833,) in which the defendant acknowledged himself under obligation to discharge the £45 due from the son ; but the memorandum referred to in the guaranty was not produced. The jury, in answer to a question put by the judge at nisi prius, said they found *that the guaranty of May 11th referred to the son's note,* and found for the plaintiff £47. White moved for a new trial, because the description in the note was uncertain ; or if not, the extrinsic evidence adduced to give it application was insufficient. On the first point, the court sustained the finding. It is more material to the question before us to see how the second point was disposed of. White said, " The letter of May 11th, which is relied on as a guaranty, does not state any consideration with certainty, and is therefore not binding. The consideration should be expressed *with sufficient certainty to exclude the necessity of parol evidence.* The defendant in this letter says, ' you will be so good as to withdraw *the* promissory note.' [*Littledale,* J. : Do you say the *amount* of the note must be stated ? If so, should the *date* also be specified ? *Parke,* J. : It appears by the letter to be a promissory note *held* by the plaintiff. If that is not sufficient, how far would you carry the objection?] *White :* It does not even appear that *the* note was *a note given by the son.* [*Parke,* J. : A guaranty is to receive its application from the state of facts as shown in evi-

Fish v. Hubbard's administrators.

*dence.* Here there was no proof of any promissory note but one.] *White :* There might be no doubt in point of fact ; but *the question is, whether enough was expressed in writing to satisfy the statute of frauds.* The objection arises before the evidence in explanation can be received. On production of the document, it does not appear in writing what the consideration for the promise is. [*Parke*, J. : Suppose, instead of 'the promissory note,' it had been 'the hogshead of tobacco in your possession,' must it have been described by marks and numbers ? *Lord Denman*, Ch. J.: Or 'the corn you sold my son ;' must it have been shown what corn it was ? *Parke*, J.: Even if the note had been fully described, you might say that it was possible there might have been another note ; and the contrary should have been shown."] *Lord Denman* finally remarked, " There would be no end to such a course of objection. It might be said that the plaintiff perhaps had another son, and that the letter did not show what son was meant." *Littledale*, J. said, " It is true, the letter leaves it uncertain what the note was, and whether it was a note of the father or of the son ; and if it had appeared that there were two notes, one given by each, I do not think parol evidence could have been received to show which was meant. So if there had been two notes in question for the same sum, but of different dates. But *when upon the evidence*, only one note appears to be in question, no such explanation is necessary, and the statement in writing is quite sufficient." *Parke*, J. said, " The defendant by his letter requests the plaintiff to withdraw some promissory note which is in his possession, and promises, on his doing so, to pay the amount, &c. There is no doubt that the giving up of any note upon which the plaintiff might have sued, would be a sufficient consideration. Then, the consideration being executory, the plaintiff is to show that he has fulfilled it, and, for that purpose, must of necessity prove by parol evidence, that the note withdrawn by him was the thing meant by the agreement."

I have thus preferred letting the judges speak for themselves in the case cited ; and it appears to me their remarks are of easy application to the covenant before us. I will

only ask, how was Mr. Justice Parke and Lord Denman authorized to say the guaranty spoke of a note in the plaintiff's possession? It said nothing of that in terms. Their version went upon the absurdity of requesting the plaintiff to withdraw a note which he had no 'control over; just as in the covenant before us, it would be absurd to say that the parties might mean a dam and machine and mill that neither of them owned. The case of *Crawford* v. *Jerrett's heirs*, 2 Leigh's R. 630, 637, was a case similar in principle to *Shortrede* v. *Cheek*, and goes quite as far. Mr. Wigram, Extr. Ev. 59, 138, says of a devise, &c., " Every claimant under a will has a right to require that a court of construction, in the execution of its office, shall, *by means of extrinsic evidence*, place itself in the situation of the testator, the meaning of whose language it is called upon to declare." See also per Parke, J. in *Doe, ex dem. Templeman*, v. *Martin*, 1 Nev. & Mann. 524, and per the Lord Ch. in *Guy* v. *Sharp*, 1 Myl. & K. 602. It appears to me the remark is applicable to every description in a written instrument. It is strikingly illustrated by the case of *Hodges* v. *Horsfall*, 1 Russ. & Mylne, 116, which presents, I think, a case of still greater uncertainty than any we have noticed. The defendant agreed to demise certain premises to the plaintiff, " with additions intended to be made thereto by S. H. [the plaintiff,] *as per plan agreed upon.*" The only question between the parties was, what plan ? This involved the inquiry, between *what parties* ? Was it a plan on paper or by parol ? It was not disputed that the plan must be such as had been agreed upon *by the parties*. Then two different plans on paper appear to have been talked of between them, and the proof was not decisive which was agreed upon. Therefore the master of the rolls, and afterwards the lord chancellor, held that a case was not made out. But neither seem to have doubted, that the apparently great uncertainty on the face of the instrument might have been obviated on a full case being established by the evidence *aliunde ;* yet the question of uncertainty was ably argued by counsel for the defendants. The point they made was, that the words were not specific or descriptive of any plan ;

but they merely mentioned some plan on *paper* or by *parol;* and the uncertainty was such as made it dangerous to go into parol evidence. Lord Chancellor Eldon replied that he considered the reference sufficient on all the authorities, and proceeded to examine the sufficiency of the testimony. Mr. Wigram adds a *quere*, whether this case did not go too far. Wigr. on Extr. Ev. 101, note (*b*). But he admits that *Shortrede* v. *Cheek*, is not to be questioned, and thinks it sustains his criticism on *Hodges* v. *Horsfall*, id. *addendum*, before p. 1. The certificate of a notary that notice of protest was put in "*the* post office," was held explainable by showing orally at what post office the notice was in fact mailed. *Gale* v. *Kemper's heirs*, 10 Lou. Rep. (Curry,) 205. Again; notes were payable to "the commissioners of the town of Demopolis," without naming them; and the plaintiffs were allowed to recover, on showing by proof *aliunde*, that *they* were such commissioners at the date of the note, and that it was delivered to them. *Mundine* v. *Cranshaw et al.*, 3 Stew. R. (Alabama,) 87.

But we are admonished again and again, by the counsel for the defendants, that *ambiguitas patens* is not explainable; and that every ambiguity is *patent* which appears upon the face of the instrument. Phil. Ev. 467, Am. ed. of 1823. Bacon's Elem. Rule 23. So says Lord Bacon; and he adds, that "*ambiguitas patens* is never holpen by averment and the reason is, because the law will not couple and mingle matter of specialty, which is of the higher account with matter of averment, which is of inferior account in law; for that were to make all deeds hollow, and subject to averments, and so, in effect, that to pass without deed, which the law appointeth, shall not pass but by deed." It is not necessary to deny this maxim as limited and explained by the examples which the author himself gives. They are only two: one of a gift to *J. D. et J. S. et hæredibus*, omitting to say the heirs of which. The other a gift in tail, remainder in tail; "provided that if he, they or any of them, do any," &c. restraining them of certain acts, in order to perpetuate the estate. In the first case you cannot aver whether the gift intended the heirs of J. D. or J. S. nor in

the second, that the proviso was intended only of him in re-
mainder.  In short the rule is one of construction, applica-
ble to the words of a will, deed or any express contract;
and it is confined to words which have no reference, by im-
plication or otherwise, to matters out of the writing in ques-
tion.  This is obvious from what he adds immediately after
his two examples : " of these, infinite cases might be put,
for it holdeth generally, that all ambiguity of words *by mat-
ter within the deed*, and *not out of the deed*, shall be holpen
by *construction*, or in some cases by *election ;* but never by
*averment ;* but rather shall make the deed void for uncer-
tainty."  It is impossible, if we take *ambiguity* in its broad
sense of *doubtfulness, uncertainty* and *double meaning*, (see
Johnson's Dict.) to maintain Lord Bacon's maxim one mo-
ment, when we compare it with the adjudged cases.  Mr.
Wigram has started, and, I think, solved the inquiry into the
extent of the maxim.  He says, it may be asked whether
the rule is not violated when explanatory evidence, or evi-
dence of collateral facts and circumstances is admitted in
aid of a description which *upon the face of the will* is inac-
curate or imperfect.  With confidence, it is answered no.
The inaccuracy of the testator's language, in such cases, is
undoubtedly *patent ;* but as the meaning of inaccurate [un-
certain] language *may* be unambiguous, it is impossible to
predicate of a will, in such cases, or in any case, that it is
ambiguous, until the effect of bringing the language into
contact with the facts to which it refers, shall have been
tried, [and here he instances the application of the word *mod*
in *Goblet* v. *Beechy*.]  He adds " To what class of cases,
then, does Lord Bacon refer, in speaking of *patent ambigu-
ities ?*  Let his own commentary upon the rule answer for
him.  The examples by which he illustrates that part of the
rule, which relates to patent ambiguities are not cases of
misdescription of the *object* of the testator's bounty or of the
*subject of disposition ;* but cases in which (the persons and
things being *sufficiently* described) the testator's general in-
tention with respect to them is ambiguously expressed.  A
devise to *one of the sons* of A. who has several sons, is a case
within the principle.  No person in particular is intended by
the will."  Wig. on Exr. Ev. 134, 5.

It is by such a course of reasoning alone that the rule can be saved. No one can deny that it is very loosely expressed, though a veneration for the great character of Lord Bacon as a logician, has led English judges and writers on evidence into a constant repetition of it, without often adverting to its singular generality. It never was acted upon in its widest extent, and as far as the decisions have gone, it is said by a learned judge, that after several efforts he had found himself unsuccessful in his attempts to reconcile them. *Story*, J. in *Peich* v. *Dickson*, 1 Mason, 11. In the case at bar, if the defendants' intestate had covenanted to supply water from "my mill dam," it might still be objected that an ambiguity remains, for he might have had more than one dam, or for want of stating the town, because he might have had a dam in another town, and so of the county and state; which defects would all be obviated by showing, as was proposed here, that he really owned but one dam in the world, and that just above the carding machine and fulling mill of the plaintiff, on the same stream. In *Peich* v. *Dickson*, 1 Mason, 12, Story, J. said, "If, by a written contract, a party were to assign his *freight* in a particular ship, it seems to me that parol evidence might be admitted of the circumstances under which the contract was made, to ascertain whether it referred to *goods* on board of the ship, or an *interest* in the earnings of the ship; or, in other words, to show in which sense the parties intended to use the term." In the case thus put, we will suppose the facts in evidence, that the assignor had at the time no *interest* whatever in the ship itself, but only goods on board; is it possible that Lord Bacon's rule must be received to shut our eyes on the palpable conclusion, that he meant the goods and not the ship-rent? And see *Cole* v. *Wendell*, 8 Johns. R. 116 ; also *Mechanics' Bank* v. *The Bank of Columbia*, 5 Wheat. 326, 336. I remember some years ago, I think at the Clinton or Essex circuit, trying an action on a promissory note, payable in *deal*. The parties were neighbors in the village of Keeseville, and the defendant a blacksmith, who insisted by way of defence that he had always been ready to pay the note by services in the line of his

trade. On the facts coming out, I asked the jury what the word *deal* meant; and they found in answer that it meant services in the line of the defendant's trade. I think that case was afterwards before this court, on some motion which involved the question whether such an ambiguity could be so explained. Be that as it may, I am confident my decision was not disturbed; nor can I bring myself to believe that such a contract or such a defence must fail, because it happens to come literally within Lord Bacon's rule. The remarks of Sir Thomas Plumer, M. R. in *Colpoys* v. *Colpoys*, Jacob, 451, gives the sense of the English cases, and he says the books are full of instances sanctioned by the highest authority both in law and equity : " When the person or the thing is designated on the face of the instrument, by terms imperfectly understood and equivocal, admitting either of *no meaning* at all by themselves, or of a variety of different meanings, referring tacitly or expressly for the ascertainment and completion of the meaning to extrinsic circumstances, it has never been considered an objection to the evidence of those circumstances, that the ambiguity was *patent*, manifested on the face of the instrument." He had before asserted that rather than allow the instrument to be avoided, words *wholly indefinite* in themselves, the instrument at the same time furnishing no materials by which they could be defined, might be explained by a resort to extrinsic circumstances, and should be so explained. The search is after the real intention ; and so powerful is the dominion of those circumstances in showing it, that they were lately received by the supreme court of the United States to change the meaning of a contract wherein the words were neither imperfect when taken according to their ordinary import, nor in any sense affixed to them by usage. On the 19th of November, 1831, the defendant, by a note in writing, agreed w ... the plaintiffs to hire of the latter their steam boat *Franklin*, until " the *Sydney*" should be placed on a certain route. Oral evidence was given, first by the plaintiffs, that " the Sydney" meant the defendant's steam boat, then being built at Baltimore, and that she was not placed on the route till the 7th February, 1832. This

was not even objected to, though the words were obviously quite as uncertain as those in the case at bar. The defendant then offered to show that the Franklin was wanted by him to ply from Washington to Potomac creek, on a certain mail route for which he had been contractor during several years, but on which no boat had been or could be employed after the ice had stopped the navigation; and that the Franklin was thus stopped about the 5th of December; all these facts being known to the plaintiffs, who also knew that the defendant was building the Sydney for the same route. The plaintiffs claimed pay according to the words of the contract, " until the Sydney was placed on the route." But the court held that, under the circumstances, neither party could be considered as meaning that the Franklin should draw wages after the carriage of the mail by water had become impracticable, though the Sydney should happen to be unfinished. *Bradley* v. *The Washington &c. Steam Boat Co.*, 13 Peters, 89. Three judges, Thompson, Catron and Story, justices, dissented on the ground that the contract was unambiguous, and new and independent stipulations were sought to be ingrafted upon it. The majority of the court may have carried the principle too far; but the case is useful, whether we look at the proof on the side of the plaintiff or defendant, as showing the great power of extrinsic evidence in giving meaning to the words of the parties. Without going so far as to allow that the time agreed upon could be shortened, we may safely adopt what was conceded both by the counsel and the court, that "the Sydney" might by the circumstances, be made to read " the *steam boat* Sydney, *now owned* and being built by the defendant *at Baltimore.*" The writing itself neither called " the Sydney" a *boat*, nor declared *to whom* it belonged, nor *where* it lay.

Several cases were cited by the counsel for the defendant. I have examined them, and find nothing decisive against our ability to sustain the covenant before us. My main attention has been directed to the cases cited by him from our own reports. *Abeel* v. *Radcliff*, 13 Johns. R. 297, 299, was clearly a case of *patent ambiguity*, within Lord

Bacon's rule. The clause rejected for uncertainty, had no reference to a subsisting object. The hypothetical *dictum* in *Jackson, ex dem. Lowell,* v. *Parkhurst,* 4 Wendell, 369, 374, I am certainly not prepared to concede in its full extent. A grant of "all *the land* lying north of a certain highway, in a certain town," I do not believe to be irremediably void, provided it be shown that the grantor owned land there. A case not cited, at least not included in my notes of the argument, is the strongest. *Schuyler* v. *Van Der Veer,* 2 Caines, 235. It was an action on an award, " that the said John Schuyler and John Van Der Veer, should finish *the house* between them, and be so far complete as to board it over the roof, and the floor complete, and a chimney ; and, if the said John Van Der Veer should keep *the stove,* then he should pay John Schuyler fifty shillings, for it. That the costs of *the arbitration* should be jointly borne." A majority of the judges clearly thought the award uncertain, as referring to *the house, the stove,* and *the costs,* without saying *what house, what stove,* or *what costs ;* though Thompson, J. thought all the defects might have been obviated by proper averments. It is enough, however, to say that the question stood and was decided upon a demurrer to the replication which set forth the award without attempting to make it certain by averments. It was impossible for the learned judges to pronounce absolutely, in advance, that the certainty of what was meant could not be made very clear by the surrounding circumstances. I will barely refer to Watson on Arb. and Awards, 122, *et seq.,* indeed the whole of section three, (now, I take it, in the hands of the American profession generally, through that excellent series of publications, the Law Library, No. 31, 32, and the cases there cited,) in order to say, that *Schuyler* v. *Van Der Veer,* might now, perhaps, be deemed a case proper for reconsideration, even in respect to the principal points decided by it.

On the whole, it is impossible to doubt of the meaning of the covenant in question, on the extrinsic or collateral facts offered in evidence at the trial. It s possible that the declaration may have been defective, if it did no more than

Fish v. Hubbard's administrators.

set forth the covenant in question *verbatim*. It may have been too meagre for want of averring or reciting the facts offered in proof; but this is not a motion in arrest, and the declaration, therefore, is not before us. If the plaintiff shall deem it defective, he may move to amend.

The question before us is one upon evidence to explain and apply the covenant. We think that the evidence offered for that purpose was improperly rejected; and that there must be a new trial, the costs to abide the event.

Ordered accordingly.