**William Whalen v. Thomas C. Stephens and Charles Lay.**

1. CHANCERY PRACTICE—*When Objections Come Too Late.*—In a proceeding to dissolve a partnership and for an accounting of partnership matters, if evidence relating to negotiations between the parties prior to the execution of the partnership agreement is admitted without

objection before the master, and no exceptions taken to his report, the hearing before the chancellor is limited to questions of this nature raised by the exceptions, and if such questions are not so raised, error can not be assigned in respect to them.

2. ESTOPPEL—*Of a Party to Complain of the Admission of Incompetent Evidence.*—Where a party litigant is examined as a witness in his own behalf and gives his version of the negotiations between him and his opponent prior to the execution of the agreement between them, and the evidence of the parties is conflicting and admitted without objection, neither party can be heard afterward to insist that such statements and conversations were not competent evidence.

3. CONTRACTS—*Extrinsic Evidence as to the Intention of the Parties.*—For the purpose of ascertaining the intention of the parties to a contract, courts will endeavor by extrinsic evidence of such facts as the parties had in view, to place themselves as nearly as possible in the place of the contracting parties so that they may understand the language used, in the sense intended by them.

4. SAME—*To be Enforced as the Parties Mutually Understood Them.*—In construing contracts, courts will seek to discover and give effect to the intention of the parties, so that the performance of the contract may be enforced according to the sense in which the parties mutually understood it at the time it was made; and greater regard is to be had to their clear intent than to any particular words which they may have used to express it.

6. PARTNERSHIPS—*When a Court of Equity Will Decree a Dissolution.*—Courts of equity will decree a dissolution of a partnership when the disagreements and disputes between the partners have become so violent and lasting as to prevent any beneficial results from the continuance of the relation.

**Bill for an Accounting,** and a dissolution of a partnership. Appeal from the Circuit Court of Cook County. Heard in this court at the March term, 1900. Affirmed. Opinion filed November 22, 1900.

**Statement.**—January 10, 1899, Thomas C. Stephens, appellee, filed a bill against appellant, William Whalen, and appellee Charles Lay, and Albert W. Barnum, for an accounting, and a dissolution of partnership between Stephens, Lay and Whalen. The bill alleges that the following was the agreement of partnership:

"This agreement, made this 12th day of August, 1897, witnesseth:

"That whereas, William Whalen, of Eureka, Eureka county, Nevada, has this day sold for the consideration hereinafter expressed, to the copartnership hereinafter described,

consisting of William Whalen, of Eureka, Eureka county, Nevada, Charles Lay, of Chicago, Illinois, and Thomas C. Stephens, of Chicago, Cook county, Illinois, for their joint interest, all his, the said William Whalen's, holdings of stock in the St. Peter's Consolidated Gold & Silver Mining Company, a corporation organized and existing under and by virtue of the laws of the State of Illinois. The following copartnership is formed: The said William Whalen, Charles Lay and Thomas C. Stephens have this day entered into articles of equal copartnership for the following purposes, namely: To take the necessary steps to revive and re-establish the Whalen Consolidated Copper Mining Company, a corporation existing under and by virtue of the laws of the State of Illinois, and to re-open and renew operations upon what are known as the Whalen mines, located in the Antelope Mining District in Eureka county, Nevada, and to proceed at once with the work and development of the said mines and such other joint enterprise as they may mutually agree upon.

" It is further agreed that the said copartners shall combine and consolidate their several interests into one interest, and that no one individual interest shall be voted, disposed of, or transferred without consent and co-operation of the other two interested.

"All expenses connected with the work and business aforesaid shall be borne equally among the partners. And the said partners hereby mutually covenant and agree to and with each other that during the continuance of the said copartnership neither of them shall or will indorse any note, draft, bond or obligation, or otherwise become surety for any person or persons whomsoever, without the consent of the other partners, and at the end of other sooner termination of their copartnership, the said copartners each to the other shall and will make a true, just and final account of all things relating to their said business, and in all things truly adjust the same, and all and every the stock and stocks, and increase thereof, which shall appear to be remaining either in money, goods, stocks, wares, merchandise, fixtures, debts or otherwise, shall be divided between them, share and share alike.

" It is further agreed by and between the said partners, that there shall be had and kept at all times during the continuance of their copartnership, perfect, just and true books of account, wherein each of the said copartners shall enter and set down as well all money by them or either of them received, paid, laid out and expended in and about

the said business, and also all goods, wares, stocks, commodities and merchandise by them or either of them bought or sold by reason of or on account of the said mining business, and all matters and things whatsoever to the said business and the management thereof in any wise belonging, which said books shall be used in common between the said copartners, so that each of the said copartners may have access thereto without any interruption or hindrance of the others, and also that said copartners once in each month during the continuance of their copartnership, on or before the fifteenth day of each month, or oftener, if deemed expedient, shall make, yield and render each to the other a true, just and perfect account of all profits and increase or loss by them or either of them acquired or sustained; and all gains, profits and increase that shall come, grow or arise from or by means and out of their said joint business, shall be divided between them, share and share alike, and all loss that shall happen to their joint business by ill-commodities, bad debts, or otherwise, shall be borne and paid between them equally, and that such profits and losses shall be divided between them once in each month, or oftener, as shall be mutually agreed between them.

" The consideration for the transfer by the said William Whalen to the said copartnership aforesaid is the advancement by the said copartnership to the said Whalen of all necessary moneys to defray the expenses of the said Whalen in and about his contemplated trip to Eureka, Eureka county, Nevada, including his transportation and living expenses to Eureka and return; and as a further consideration for the transfer and sale of the stockholdings of the said Whalen to the copartnership aforesaid, said copartners and each of them hereby agree to advance such other money as may be necessary to defray the expenses of reasonable attorney's fees in and about procuring certain books and papers belonging to the St. Peter's Consolidated Gold & Silver Mining Company, and the arranging and calling of necessary stockholders' and directors' meetings for the purpose of reviving and re-organizing the said the Whalen Consolidated Copper Mining Company.

" As a further consideration for the transfer of stock by the said Whalen to the copartnership aforesaid, each of the said copartners agrees to engage his best services and endeavors in and about promoting and advancing the interests of the said Whalen and of the Whalen Consolidated Copper Mining Company, devoting such time, labor and

Whalen v. Stephens.

attention as may be for the best interests of the said Whalen and of the copartnership aforesaid.

" It is further agreed that the said private stockholdings of the said William Whalen, this day transferred as aforesaid, shall remain in escrow with Albert W. Barnum, at 1009 Chicago Stock Exchange Building in Chicago, Cook county, Illinois, to be voted as a unit at such times as each of said copartners shall mutually agree among themselves, and that no part of said stock shall be voted or disposed of by one partner without the full consent of the other partners.

" It is further agreed that the said William Whalen shall have the exclusive management of the said mines and full control of all labor employes hereafter to be employed.

" It is further agreed that no salaries shall be paid to any of the partners herein named, or to any officers or agents hereafter to be elected, until the mines and mining property aforesaid are producing an income over and above all expenses, and among such expenses shall be included the obligations and contracts hereafter to be made by the said Whalen for labor claims and the costs of material, all of which said obligations shall be paid by the said copartners; all such payments to be reimbursed out of the general fund of the Whalen Consolidated Copper Mining Company, when re-established.

" It is further understood and agreed that no part of said stock purchased by this copartnership from the said William Whalen shall be sold for less than $25 per share, but each partner shall do all in his power to make sale of the stock of the said company.

" This copartnership shall exist until such time as the partners shall mutually agree to dissolve, and shall be known as Lay, Stephens & Whalen.

" It is further mutually agreed that no partner shall enter into any individual speculation or speculative business whatsoever without the consent of his partners.

" All checks and drafts upon the general fund of the Whalen Consolidated Copper Mining Company or of the copartnership shall be signed by one of said partners and countersigned by the other two.

" Wm. Whalen,

" Chas. Lay,

" Thomas C. Stephens.

" Witness :

" William H. Gruver,

" Robert Humphrey."

It is further alleged, in substance, that the parties to the agreement entered upon the performance of their duties under it and that the complainant has performed all the duties devolving on him; that complainant and Lay caused the necessary steps to be taken to revive and re-establish the Whalen Consolidated Copper Mining Co. (hereafter called the Whalen Co.), and to develop said mines, and to that end expended a large sum of money and devoted much time; that the private stock of Whalen, which the agreement provided should be and remain with Barnum, were Whalen's stockholdings in the Whalen Co. and in the St. Peter's Consolidated Gold and Silver Mining Co. (hereafter called the St. Peter's Co.); that at the date of the agreement the St. Peter's Co. owned all the capital stock of the Whalen Co. and that said partners so arranged that the greater part of said stock was assigned by the St. Peter's Co. to Whalen, and 79,980 shares of said stock became and was the stock referred to in the partnership agreement. The Whalen Co. is an Illinois corporation, with a capital stock of $2,500,000 divided into 100,000 shares of the par value of $25 each. Pursuant to the partnership agreement a board of directors of the Whalen Co. was elected and said directors served until their successors were elected. At a regular annual meeting of stockholders of said company, held January 12, 1898, the same directors were re-elected for another year, since which time various changes in the directory have been made. The next regular annual meeting of stockholders will occur Wednesday, January 11, 1899, at eleven o'clock A. M. Large funds of complainant and of the partnership have been expended in promoting and developing the business of the Whalen Co. Pursuant to the partnership agreement there was issued by the Whalen Co. to complainant, Whalen and Lay, partners as aforesaid, a certificate numbered 1084, for 78,981 shares of the stock of said corporation, which stock was partnership property. February 10, 1898, while complainant was absent from the city of Chicago on partnership business, Whalen and Lay, without complainant's knowledge or consent, made the following agreement:

Whalen v. Stephens.

"This agreement, made this 10th day of February, 1898, by and between William Whalen and Charles Lay, two of the partners of Lay, Stephens & Whalen, which partnership was formed by an agreement dated August 12, 1897, witnesseth: That in the absence of Thomas C. Stephens in Boston, certain matters have been presented which show it to be for the best interest of the said partnership of Lay, Stephens & Whalen, that certificate 1084 of the stock of the Whalen Consolidated Copper Mining Company shall be canceled, said certificate being for 78,981 shares; also that other certificates belonging to the said firm shall all be canceled and one certificate issued to William Whalen for 82,115 shares, being certificate No. 1136, to be held by him, the said William Whalen, for the present, being all the time the property of the said Lay, Stephens & Whalen.

"Witness our hands and seals as above set forth, February 10, 1898.

"WILLIAM WHALEN,  [SEAL.]<br>
"CHAS. LAY.  [SEAL.]"

Thereupon Lay and Whalen, without complainant's knowledge or consent, canceled, so far as they were able to do so, said certificate for 78,981 shares, and issued another to Whalen for 82,115 shares of stock of the Whalen Co. And thereafter, by agreement between Lay and Whalen, the last mentioned certificate was canceled, and a new one, numbered 1190, of date June 22, 1898, for 72,118 shares of Whalen Co. stock, was issued to Whalen in his name, and was by him deposited with Albert W. Barnum for the benefit of the partnership. All of said stock, and, in addition thereto, 1,865 shares not represented by any outstanding certificate, was and is the partnership property. Whalen claims that certificate 1190 is his, and that he will vote the same at the next annual stockholders' meeting, and elect, as he would thereby be able, a board of directors hostile to complainant and Lay, and would exclude complainant and Lay from all management and control of said Whalen Co., and from benefits and profits of said partnership. Whalen has stated that after January 1st inst., said partnership would not exist.

For many months past complainant has been unable to procure an accounting from Whalen, and, to wit, $10,000

of partnership money has been expended by him, or is in his possession. Whalen has threatened and intends to obtain from Barnum stock certificate numbered 1190, and to dispose of the same as his own. Unless Whalen is restrained from obtaining said certificate and Barnum is restrained from delivering the same to Whalen, complainant will suffer irreparable loss, etc. Prayer for an injunction, an accounting, dissolution of partnership, etc.

January 10, 1899, Lay filed an answer, admitting the allegations of the bill, and also a cross-bill, by which he adopts, as part of his cross-bill, the averments and prayer of the bill. February 1, 1899, Albert W. Barnum filed his answer neither admitting nor denying the allegations of the bill, and at the same date he filed a cross-bill averring in substance that June 22, 1898, Whalen, Stephens and Lay called at his office together and deposited with him certificate 1190, for 72,118 shares of stock of the Whalen Co., and that it was then understood that he was not to part with said certificate without the joint consent of Whalen, Stephens and Lay, and that the certificate was still in his possession; that it runs in the name of William Whalen, and that he holds it as a mere trustee and stockholder, subject to the order of said three persons, and has no interest in it, and is willing to deliver it to the person or persons entitled thereto, and offers to bring it into court, etc. Prays that Stephens, Whalen and Lay may be required to interplead, etc., and that they may be restrained from commencing any action against him. The cross-bill is sworn to.

Stephens and Lay answered Barnum's cross-bill, but April 10, 1899, by agreement of the parties, certificate 1190, for 72,118 shares of the Whalen Co. stock, was turned over to and impounded with the clerk of the court, subject to the further order of the court, and thereupon the cross-bill of Barnum was dismissed, and he was discharged from further liability.

March 3, 1899, Whalen filed his answer to the bill. He admits entering into a partnership agreement with the complainant and Lay, but neither admits nor denies that what

purports, by the bill, to be a copy of the agreement, is a true copy; admits that Stephens and Lay, at the outset, furnished him some assistance in the way of services; and that, by the agreement, the St. Peter's Co. stock was to remain in Barnum's hands; and avers that, September 30, 1897, said stock was turned over to Lay for the partnership of Lay, Stephens & Whalen. Avers that Albert W. Barnum was his attorney, and had in his possession 79,981 shares of Whalen Co. stock, which he, Barnum, delivered to the directors of the St. Peter's Co. September 30, 1897, or soon thereafter, and that said board of directors delivered the same to him, Whalen; that said shares were represented by small certificates, which he, Whalen, had canceled for a new certificate which was issued to him, and which was retained by him till June 22, 1898, when he deposited it with Barnum to act as custodian of the same, and as his agent for the sale and disposal of the same. The remainder of the answer consists, substantially, of a 'denial of material allegations of the bill. In respect to the alleged agreement of February 10, 1898, he avers that he can neither read nor write, and that if he signed that agreement, he did so by reason of false representations of its contents; that it was never read to him, and he didn't know of its existence till it appeared in the bill. In the concluding part of his answer he admits that there should be an accounting of the partnership transactions. The issues having been made up, the cause was referred to the master to take proofs and report the same, with his conclusions. The master reported, finding, in substance, that the partnership assets consisted of 73,340 shares of the capital stock of the St. Peter's Co., certificate 1190 for 72,118 shares of the capital stock of the Whalen Co., and, in addition, 1,865 shares of the latter company, for which certificates had not been issued, and that all of said shares should be equally divided between Stephens, Lay and Whalen; that Stephens was indebted on the partnership accounting to Whalen in the sum of $479.17, and that, on the payment by Whalen to Stephens of the costs which had been paid by Stephens, Stephens should

pay said sum to Whalen, and that, on the partnership accounting, Stephens was indebted to Lay in the sum of $790.02, which he should be ordered to pay; and that complainant was entitled to the relief prayed.

The court overruled all objections except the tenth and eleventh, which are unimportant, and decreed in accordance with the master's report. From the decree so rendered the appeal is taken.

WILLIAM P. SHOCKEY and JAMES D. SPRINGER, attorneys for appellant.

JESSE A. and HENRY R. BALDWIN, attorneys for Thomas C. Stephens, appellee.

GEORGE R. JENKINS, attorney for Charles Lay, appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The chief question in controversy is, whether appellees Stephens and Lay have any interest in the stock of the Whalen Consolidated Copper Mining Co. Complainant and Lay claim that they have each one-third interest in said stock. Appellant claims the stock is wholly his, and that appellees have no interest whatever in it.

There is no controversy between the parties as to the amount of the Whalen Co. stock in question.

The Whalen Co. is an Illinois corporation and its capital stock, the number of shares into which it is divided and the par value of each share, are as stated in the bill. The location of its principal office is in Chicago, and May 17, 1882, its articles of incorporation were duly recorded. The St. Peter's Co. is also an Illinois corporation. Its capital stock is $5,000,000, divided into 100,000 shares of the par value of $50 each. The location of its principal office is in Chicago, and it was organized March 5, 1887. Whalen subscribed for 99,996 shares of the stock of the St. Peter's Co. and prior to and at the date of the partnership agreement, was president of the company. He also subscribed

for 99,996 shares of the stock of the Whalen Co. Prior to the date of the partnership agreement, the St. Peter's Co. and the Whalen Co. each had mines in Nevada, the former silver and the latter copper mines; but appellant, who was the manager of both companies, was confined in the Missouri penitentiary for three years, expiring July 13, 1897, for obtaining money by false pretenses, as appears by his own letter, and during that time the mining properties in Nevada were lost by the companies. At the date of the partnership agreement, the Whalen Co. had no property, and the only property which the St. Peter's Co. had was certain stock of the Whalen Co. which had been donated to it by appellant. Such was the situation at the time appellant commenced negotiations with appellees which culminated in the partnership. Lay testified that about July 20, 1897, he met appellant and had interviews with him several days in succession thereafter; that appellant told him of wonderful copper property which he had owned in Nevada, but had lost, and then had no title to it, and asked the witness to assist him; to take charge of re-organizing and reviving the company and securing money to acquire the title of certain miners to the property; that witness told him he had no money himself, but thought he could secure the assistance of Thomas C. Stephens, the appellee, who had been a banker; that, at seven o'clock in the evening the witness, Stephens and Whalen met at the Atlantic Hotel in Chicago, and for about four hours discussed the whole matter of securing the Whalen property and the miners' claims which were then in the hands of Kenney, Doherty and Thomas R. Whalen, a cousin of appellant. "Appellant said he would like to form a partnership with us and would give us one-third interest in both the St. Peter's and Whalen companies." Stephens then agreed that he would furnish appellant the money and a pass to go to Nevada. Subsequently Mr. Hargis drew up an agreement, in accordance with a verbal statement made to him by Stephens, which was submitted to Barnum, appellant's attorney, and finally Barnum drafted the agreement of August 12, 1897, which

was read over to and signed by the parties. Hargis testified that he had a talk with all the partners before drafting the first agreement, and that Stephens told him, in the presence of Whalen and Lay, that he had given to Stephens and Lay each one-third interest in the Whalen Co. stock, and that Whalen said that was all right.

Counsel for appellant now objects to so much of the foregoing evidence as relates to negotiations between the parties prior to the execution of the written agreement of partnership. No objection was made to the evidence when taken, nor among the objections to the master's report is there any objection relating to the admission, exclusion or refusal to exclude evidence. The objections to the master's report were ordered to stand as exceptions on the hearing. The hearing is limited to questions of this nature raised by the exceptions, and when such question is not so raised, error can not be assigned in respect to it. The objection comes too late. Prince v. Cutler, 69 Ill. 267; Pennell v. Lamar Ins. Co., 73 Ib. 303; Jewell v. Rock River Paper Co., 101 Ib. 57; 14 Am. & Eng. Ency., p. 944.

An additional reason why appellant can not avail of the objection, is that he, being examined by his solicitor, gave his version of the negotiations between him and the appellees prior to the execution of the written agreement, materially contradicting the testimony of Lay and Hargis.

In Moyer v. Swygart, 125 Ill. 262, a bill was filed to set aside a will. The court say:

" Both parties gave in evidence the statements and conversations of decedent made by and had with him long before the making of the alleged will, and neither party will now be heard to insist such statements and conversations were not competent evidence." Ib. 277.

By the express terms of the partnership agreement Whalen transferred to the partnership of Whalen, Lay and Stephens, for their joint interest, all his stock in the St. Peter's Co. Before the execution of the agreement Whalen had transferred to the St. Peter's Co. all his stock in the Whalen Co., and at the date of the agreement it was held by

the former company.   The stockholders of the St. Peter's Co., were, therefore, the equitable owners of the stock of the Whalen Co., and  Whalen, knowing that the St. Peter's Co. held all the Whalen Co. stock, must, we think, have intended, by the agreement, to transfer to the partnership the Whalen Co. stock.   The object of the partnership is stated in the agreement to be " to take the necessary steps to revive and re-establish the Whalen Co., and to re-open and renew operations upon what are  known as the Whalen mines  in the Antelope mining district in Eureka county, Nevada, and to proceed at once with the work and development of said mines."   The mines referred to in the agreement by the words, " known as the Whalen mines," are the Whalen copper mines.   This clearly appears from the evidence, including Whalen's testimony.   The contract further provides for the procuring of books and  papers belonging to the St. Peter's Co. and calling stockholders' and directors' meetings of that company, for the purpose of reviving and re-organizing the Whalen Co.   The expressed consideration for the transfer by Whalen of his stock to the partnership is that each of the partners shall engage his best services and endeavors in and about promoting the interest of Whalen and the Whalen Co.

By the agreement, Whalen was to have the exclusive management of the mines and the control of employes. No salaries were to be paid until the mines should produce an income in excess of all expenses.   The agreement provides that the partners shall consolidate their several interests into one interest, and that at the end of the partnership the partners shall account each to the others, " and all and every the stock and stocks and increase thereof which shall appear to be remaining either in money, goods, stocks, wares, merchandise, fixtures, debts or  otherwise, shall be divided between them, share and share alike."

The sole final purpose of the partnership, as expressed in the agreement, was to work the Whalen copper mines. No intention whatever is expressed or indicated of working the St. Peter's mines.   If then, as Whalen claims, his part-

ners, Lay and Stephens, acquired no interest in the Whalen Co. stock, they bound themselves to furnish money, their time and best services and endeavors in promoting the interests of a company in which they had no interest whatever, and in the profits of which they could not participate—in other words, for practically nothing; because, with the exception of the Whalen stock, the St. Peter's Co. had no property; and its stock was, consequently, worth nothing in the market. The partnership not being bound by the agreement to work the mines formerly belonging to the St. Peter's Co. or any mines in the name of that company, the provision above quoted for the equal division between the partners, at the termination of the partnership, of all profits, stocks, etc., of the partnership, is, if appellant's contention be conceded, utterly meaningless.

"Courts will seek to discover and give effect to the intention of the parties, so that the performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and greater regard is to be had to their clear intent than to any particular words which they may have used to express it." Minnesota Lumber Co. v. Coal Co., 160 Ill. 85, 93.

And for the purpose of ascertaining the intention of the parties, the court will endeavor, by extrinsic evidence of such facts as the parties had in view, to place itself as nearly as possible in their position; so that it may understand the language used in the sense intended by them. Doyle v. Teas, 4 Scam. 202, 254; Barrett v. Stow, 15 Ill. 423; Sigsworth v. McIntyre, 18 Ib. 126.

In seeking to ascertain the intention regard will also be had to the practical construction, if any, which the parties by their acts have given to the contract. Leavers v. Cleary 75 Ill. 349; Alexander v. Tolleston Club, 110 Ib. 65, 76–77; C. Coal Co. v. Yoch Coal Co., 57 Ill. App. 666.

In Doyle v. Teas, *supra*, the court repudiates the rule announced by Lord Bacon, that a patent ambiguity can not be explained by parol evidence, and quotes with approval this language from Fish v. Hubbard, 21 Wend. 651:

"It is impossible to sustain this rule, if we take ambi-

guity in its broad sense, of doubtfulness, uncertainty and double meaning."

After executing the agreement Whalen went to Nevada, Stephens having furnished him with money to pay his expenses and railroad transportation as far as Omaha, and secured contracts for the copper mines formerly owned by the Whalen Co. That a meeting of the stockholders of the St. Peter's Co. was held about September 30, 1897, at which a board of directors was elected and the directors were authorized to liquidate an alleged indebtedness of the company to Whalen, and to transfer to him 79,980 shares of the Whalen Co. stock, theretofore donated by Whalen and wife to the St. Peter's Co., and that, subsequently, the board of directors transferred to Whalen 78,740 shares of the Whalen Co. stock, and passed a resolution that the remaining shares not so transferred should be transferred to Whalen when all debts due by the St. Peter's Co. should be satisfied, are matters not controverted. The appellant, in his answer, admits that 79,891 shares of the Whalen Co. stock were delivered to him by the directors of the St. Peter's Co., and that in lieu of small certificates of the same a single certificate was issued by the Whalen Co. when that company was organized and had elected a board of directors. The evidence shows that October 1, 1897, the Whalen Co. issued to Whalen a certificate for 79,470 shares in his name, on which certificate is indorsed an assignment or transfer to Messrs. Lay, Stephens and Whalen, signed, "Wm. Whalen," and on which is also indorsed:

"Canceled by request of Wm. Whalen and certificate No. 1084 issued in lieu of same.

November 1, 1897.                    Chas. Lay,
                              Secretary and Treasurer."

Whalen's signature to the assignment was proved. Stephens, Lay and Whalen were elected directors of the company and Stephens was chosen president, Whalen vice-president, and Lay secretary and treasurer of the Whalen Co., on its re-organization.

November 1, 1897, the Whalen Company issued to Lay,

Stephens & Whalen certificate number 1084 for 78,980 shares of the stock of that company. Lay testified that Whalen was present at a majority of the meetings of the board of directors.

The agreement of February 10, 1898, between Lay and Whalen, a copy of which is contained in the statement preceding this opinion, shows what became of certificate numbered 1084. It was provided by that agreement that certificate 1084 should be canceled, and a new certificate, to be numbered 1136, for 82,115 shares, should be issued to William Whalen. The agreement contains the following significant language: "to be held by him, the said William Whalen, for the present, being all the time the property of the said Lay, Stephens & Whalen." Lay testified that the agreement was drawn under the following circumstances: Whalen had told him, Lay, that he, Whalen, had made a statement that there had been more stock sold by him to third parties than there had been sold to one Cooper, and asked him, Lay, to prepare a statement which he, Whalen, could use to exonerate himself; that the stock could be canceled and left in such condition that it could be stated to have been issued to Whalen, and that it could be placed in Barnum's hands; that he, Lay, then told Whalen that it would be impossible to cancel the certificate so far as Stephens was concerned, he being absent, but that so far as they two were concerned they might do it.

Stephens, who, at the time of the agreement, was absent in Boston on business of the Whalen Co., had left his signature to about twenty blank stock certificates to be used, if necessary, in the sale or transfer of stock. In pursuance of the agreement of February 10th, certificate numbered 1136, of date February 10, 1898, for 82,115 shares, was issued to William Whalen. Indorsed on the certificate is a blank for an assignment, no name of transferee or assignee being filled in, signed, "Wm. Whalen."

June 22, 1898, after Stephens returned from Boston, certificate numbered 1136 was canceled and certificate numbered 1190 for 72,119 shares of Whalen Co. stock was issued

in Whalen's name.   Lay testified that when certificate 1190 was issued he, Stephens and Whalen went to Barnum's office and left it in Barnum's hands in escrow; that while they were all present in Barnum's office, Stephens asked Barnum if he would charge anything for taking and holding the stock, and that Barnum said that as it came under the contract agreement for him to hold it in escrow, he would make no charge for doing so.   The issue to the partnership of Whalen Co. stock, Whalen being vice-president and a director of the Whalen Co. at the date of such issue, the transfer by Whalen to the partnership of stock issued in his name, the agreement between Whalen and Lay of February 10, 1898, and the depositing certificate 1190 with Barnum by and for the partnership, are not only evidence that it was the intention of the parties in executing the agreement of August 12, 1897, that the Whalen Co. stock should be partnership property, but are, as we think, inconsistent with any other reasonable hypothesis.   These acts are a practical construction of the partnership agreement by the parties.   Whalen, in his testimony, admitted that about the date of the February agreement he signed a paper for Lay, but that he could not read and did not know what it was; that he had promised Lay and Stephens 1,000 shares each of Whalen Co. stock, when the Whalen Co. should be on a paying basis, if they would act honorably with the company and in his interest, and that Mr. Lay said they, Stephens and Lay, ought to have something to show what had been promised them, and that the paper was read to him in that way.   Lay not only testified as above stated in respect to the conversation between him and Whalen which preceded and led up to the execution of the agreement, but further testified that the contract was in duplicate, and that Whalen took one of the duplicates, facts inconsistent with Whalen's evidence.   Whalen testified that he could read figures when plainly written and could write his name.

Whalen attempted to avoid the effect of the testimony that certificate 1190 was deposited with Barnum in escrow by producing a receipt from Barnum for the certificate and

a power of attorney from himself to Barnum, both of date June 22, 1898, in respect to the shares evidenced by the certificate, which receipt and power of attorney are wholly inconsistent with the hypothesis that the certificate was partnership property or was deposited by and for the partners, and by testifying that he, Lay and Stephens were present when the receipt and power of attorney were executed and that they were read in their presence. It was testified by Lay and Stephens, that June 22, 1898, they, Lay and Stephens, left Barnum's office together; that Whalen said he had some private business with Barnum, and remained in the office after they left, and that they had no knowledge whatever of the receipt or the power of attorney. William H. Gruber, an attorney at law and notary public, employed in Mr. Barnum's office, and who took, as notary, Whalen's acknowledgment to the power of attorney, testified that Lay and Stephens were in Barnum's office the day the power of attorney and receipt were executed, but that they left the office before they were executed, and that at the time of the execution of the papers the only persons present in the office were himself, Whalen and Barnum. We think the master was warranted in discrediting Whalen's testimony.

Certain documentary evidence introduced by the appellees tends to support their contention that the Whalen Co. stock was the property of the partnership. Among such evidence is an account signed by Whalen and sent by him from Nevada to Lay, which is headed " Private account of Stephens, Lay and Whalen," is dated June 1, 1898, and relates solely to expenses incurred, etc., in connection with the working of the copper mines in Nevada. The last item in the account is "June 2, company owes up to date, $113.98." Appellant's counsel contend that the words " Private account of Lay, Stephens and Whalen," are in a different handwriting from the remainder of the document and a forgery, and the original document has been produced for our inspection. Frederick Manheim, who was appellant's clerk at the date of the document, testified that he wrote

it at appellant's dictation, and that the entire document, except the signature, "Wm. Whalen," was in his, the witness', handwriting.    Our opinion is, on inspection of the document, that, excepting the signature, it is all in the same handwriting.

Eight letters written by appellant while in Nevada to Lay were put in evidence by appellees.    These letters indicate that the stock of the Whalen Co. was partnership property.    In a letter of date May 24, 1898, this occurs:

"I would like to put some miners to work in two or three of the mines.    I will say again about sixteen men for two months—say from June to July—would make Siegel & Cooper crazy, or anybody like them.    Then *our stock* will be worth $200 a share and a great deal more than that."

In his letter of August 17, 1896, appellant writes:

"Will yourself and stockholders give me an option on your stock for six months?    You both ought to be willing to do this," etc.

In his letter of August 18, 1898, he writes:

"Before yourself and the rest of the directors of the majority of the board closes the office, I presume yourself and Mr. Stephens ought to be very willing and glad to give that option that I asked for in my letter of the 16th, the proposed stock *that you both got by contract which is in escrow*, which has not cost either of you a cent.    On the contrary, you are money ahead.    Under the present circumstances yourself and Stephens can't have any value on the stock, so I am looking for you to give me a very low option, and that will relieve you and Stephens of the great strain that you claim you are undergoing."

The only stock in escrow, so far as the evidence shows, is the stock placed in Barnum's hands by the partners June 22, 1898.    In his letter of August 20, 1898, he again asks for an option, writing:

"I hope you and Mr. Stephens will give me a reasonable option on your stock," etc.

In his letter of September 1, 1898, he writes:

"I'll give both of you twenty thousand apiece if you will give me an option on your interests, as I have asked for before."

It appears from the evidence, including one of appellant's letters, that money—the proceeds of sale of the Whalen Co. stock—was deposited in bank by appellant's consent, in the name of Lay as trustee, and that appellees were authorized by appellant to draw on the bank account. Whalen, in his testimony, refers to moneys, the proceeds of sales of the stock in question, as his private funds.

Seven witnesses testified to admissions by appellant that appellees were his partners in the business of the Whalen Co. and in working that company's mines. There was conflicting evidence on the part of appellant, comment on which would unnecessarily and profitlessly extend this opinion. Suffice it to say that we regard the master's conclusions of fact well supported by the evidence.

It clearly appears from the evidence that the sole purpose of re-organizing the St. Peter's Co. was to procure a transfer by that company of the Whalen Co. stock. The company, after its re-organization of the transfer of that stock, did nothing more. It also appears from the evidence that there was no intention on the part of Whalen or either of the other partners to operate any mines, except the Whalen Co. copper mines. It was testified by Stephens, and his testimony was not contradicted, that the partners owned all the stock of the St. Peter's Co. Owning all the stock, they were able to control the company's affairs. Appellant's counsel contend that the St. Peter's Co. could not lawfully hold the stock of the Whalen Co., citing People v. Chicago Gas Trust Co., 130 Ill. 263. If this proposition was sound, we can not perceive how it would help the appellant. If the donation by appellant to the St. Peter's Co. was void, then the stock remained the property of appellant, and he could lawfully contract for its becoming partnership property. The case cited is not the least in point. In the articles of incorporation of the gas company, one of the objects of incorporation was stated to be, to purchase and hold or sell the capital stock of other gas or electric companies. The question negatively decided was, whether the power to so hold or sell could be conferred on the gas company, under

the general incorporation law of this State. It was not decided in that case, nor has it been in any other case, so far as we are aware, that a donation of money or personal property can not lawfully be made to a corporation. It is also contended by counsel for appellant that no cause warranting a dissolution of the partnership was proved. Stephens testified that, during the summer of 1893, Whalen stated to him, in the presence of Lay, that after January 1, 1899, there would be no further partnership. It is apparent from the letters heretofore mentioned, written by Whalen to Lay, that there was a radical difference between the partners as to how the mines should be operated, and that Whalen was bitterly antagonistic to his partners. In his letter of September 6, 1898, to Lay, he writes:

"One of these days you will have to account for falsehoods and insults in touching my personal character, in the courts, just as sure as God is in heaven. I will try and bring you to justice. It's an old saying, and a true one, that it's a long road without any turn in it." * * * "I see you have turned the business of the company into scandals, that was never proven that such things or scandals ever existed." * * * "You are like Siegel & Cooper, either rule or ruin. Yes; if there was $100,000 or one million, and yourself and Stephens had access to it, as you did have, there would be nothing left for Mr. Whalen." * * * "The understanding was, and the pledge was, that you both would not tell any one about the contract that was made between us. We did shake hands and word on this, the three of us, but you both broke your pledge and told it to the two Jews. Then you set them wild to try to get a block of stock for nothing. This it was that caused all this blackmailing business. It's my opinion that you will make the same accomplishment as you did in Michigan City, and as you did in Chicago, when you were secretary of the bicycle company. I am sure I was not connected with either of those two enterprises. Yes, I knew all along that the outside stockholders did not know the rascality that was going on, and that is why you did not want to send their names and addresses. As long as you picked out remarks out of Mr. Schindel's report, why didn't you pick out all of it? Your action proves to me, and the letters you write, that you are just as crooked as a crooked stick could grow. Your his-

tory will come out after awhile, but I suppose you won't care. You have cheated the prisons out of a victim. There is plenty of honest men in them, and the Lord knows but you would have your dues if you were there. But, as I said before, it is a long road without a turn. I don't want to waste paper in writing more to you."

As before shown, appellant was so anxious to dissolve the partnership that he offered his partners $20,000 each for an option on their interest.

In Singer v. Heller, 40 Wis. 544, the court say:

" The law seems to be well settled that a court of equity will dissolve a partnership when the disagreements and disputes between the parties have become so violent and lasting as to prevent any beneficial results from the continuance of the connection," citing authorities.

In Gerard v. Gateau, 84 Ill. 121, the court say:

" That such embittered relations may exist as would render it impracticable to conduct the business, and justify a decree dissolving the partnership, admits of no discussion, on principle as well as upon authority."

See, also, cases cited in note 2, 17 Am. & Eng. Ency., p. 1105. We are of opinion, from the evidence, that such embittered relations exist between appellant and his partners as render it impracticable for them, as partners, to conduct beneficially the business of the partnership.

Lastly, it is objected that the master should have reported a statement of account, showing in detail what each partner owed to the others and to the partnership, and what the partnership owed to each of the partners. The objections to the master's report, which stood as exceptions on the hearing, do not include any objection to the form of the report. The objections, numbered 34th and 35th, are as follows:

" 34th. To the finding that the complainant is indebted to this defendant upon the partnership accounting had before the master in only the sum of $479.17."

" 35th. To the finding that upon payment by this defendant to said complainant of the costs of this proceeding said complainant should be ordered to pay to this defendant only the sum of $479.17."

These are the only objections relating to the accounting, and we do not find them sustained by the evidence.

Filed in the cause is what purports to be an abstract of the record. Little or no attempt at condensation has been made in its preparation. Questions to and answers by witnesses appear as in the record. The rule of the court requires that printed abstracts of the record, not printed copies of it, shall be filed. The decree will be affirmed.